GEORGE WILKINSON, receiver,

*v.*

DANIEL DODD et al.

In addition to the statutory requirements as to their investments, the managers of a savings bank were, by an order of the court of chancery, directed to invest certain deposits in government bonds and other specified securities. They invested about $2,000,000 in government bonds, and then delivered the bonds to F. & H., in New York, who converted them into money. They also loaned F. & H. about $845,000 in cash, which had been received by them from depositors, under an agreement that F. & H. should pay them interest therefor, and should also keep in their (F. & H.'s) vault in a box "good securities" sufficient to cover the bonds and the cash. F. & H. failed in business, and the box, to which F. & H. alone had access, was then found to contain no securities whatever. F. & H. were unable to return the bonds or the money, although they did turn over to the managers miscellaneous securities, appraised at nearly $2,000,000, in lieu of the bonds. The receiver (the complainant) endeavored to collect the bonds and money of F. & H. but was unsuccessful, and he finally agreed to sell and assign to them the bank's interest in the bonds, and to release them from all liability to the bank for the bonds and money, on condition that they would pay him $845,000, the amount of cash loaned to them, which they did, and he thereupon executed the release. The receiver alleges, in his bill, that, when he made this agreement with F. & H., he was ignorant of the managers' breaches of trust, which they then concealed and denied. One of the managers is dead, and his executors have been joined as defendants.

The receiver filed a bill setting forth the foregoing facts, and alleging that, by reason of the difference in value between the government bonds and the miscellaneous securities turned over to the managers in lieu thereof, and by reason of the managers' negligence, illegal acts and breaches of trust, the bank had suffered a loss of $400,000, and praying that the managers might be decreed to make that loss good. On demurrer—*Held*,

(1) That F. & H. were not necessary parties.

(2) That the receiver's agreement with F. & H. did not release the managers' liability for their frauds, and for their violations of the statute and the chancellor's order; nor did it ratify their acts, because there can be no legal ratification of a fraud or tort; nor did it deprive the managers of a right to contribution from F. & H., in case they should eventually be held liable, because there can be no legal, enforceable contribution among tort-feasors; nor did it damnify them by depriving them of a right of action against F. & H., because such right, at best, was a mere right to sue F. & H. without any reasonable prospect of realizing anything from F. & H., who were and are

Wilkinson *v.* Dodd.

insolvent, but, on the contrary, the receiver thereby obtained from F. & H. $845,000 for the depositors, and reduced the managers' liability, if any, correspondingly.

(3) That the loaning or delivering of the bonds to F. & H. was as palpable a violation of the statute and of the chancellor's order as the loaning of the money to F. & H., because the managers' duty and directions required them not only to invest the deposits according to law, but also to preserve those investments intact afterwards.

(4) That the executors of the deceased manager are liable to respond out of his estate for his frauds as manager, if any be proved, and hence they are proper parties.

(5) That the managers are trustees, and their duties and obligations and liabilities as such render them personally responsible for their breaches of trust.

(6) That the extent of or exemption from liability of any particular manager, because he was or was not a member of a committee of the board having exclusive knowledge and authority as to the investments of the bank's funds, or otherwise, cannot be considered on demurrer.

(7) That the fact that the receiver has, on selling $800,000 of the miscellaneous securities turned over by F. & H., realized about $3,000 more than those securities were appraised at, is not sufficient to sustain the managers' contention that the receiver will, on selling the balance, presumptively realize enough more to reimburse the bank entirely, and that hence there will be no liability, in fact, on their part, as against the receiver's averment that the bank will sustain a loss of $400,000 through their neglect and fraud.

----

*Mr. F. W. Stevens* and *Mr. J. D. Bedle,* for complainant.

*Mr. Henry Young,* for Shouley & Young, defendants.

*Mr. C. Borcherling* and *Mr. J. R. Emery,* for Reeves's executors.

*Mr. F. Frelinghuysen,* for Mercer.

*Mr. George W. Hubbell,* for Hubbell, Miller & Watson.

*Mr. F. H. Teese* and *Mr. H. C. Pitney,* for Darcy.

*Mr. J. W. Taylor,* for Baldwin and others.

*Mr. T. N. McCarter,* for Dodd and others.

Wilkinson v. Dodd.

BIRD, V. C.

The bill in this case was filed by the complainant, who had been appointed receiver of the Newark Savings Institution, against the managers of that institution, to recover from them the losses which resulted from the illegal use of the securities and of the moneys of the institution by them. To this bill, nine demurrers have been filed; six of them are general and three for want of parties. Hence, is there a want of necessary parties, or is there an absence of equity? These inquiries cover the case. I must be guided by the statement of the facts in the bill, so far as they are well pleaded.

The bill shows the insolvency of the bank and the appointment of the complainant as receiver; shows the origin of the bank and the laws upon which it rested, and which directed the manner of transacting business and fixed or prescribed the duties of its officers; shows that, on the 12th day of December, 1877, the institution was embarrassed, and that on that day the chancellor ordered: "That all deposits in said institution made on or after the 12th day of December, 1877, and until the further order of the court, shall be treated as special deposits and invested only in the bonds of this state, the city of Newark and the United States;" shows that, on the 2d day of June, 1880, on application by the managers of the institution, an order was made by the chancellor, permitting them to invest fifty per cent. of said special deposits on first bond and mortgage on real estate in this state; shows that the managers of the institution, during the time of the acts complained of, were Daniel Dodd, A. Bishop Baldwin, Henry G. Darcy, H. Hugo Franzel, Algernon S. Hubbell, Charles S. Haines, Francis Mackin, William T. Mercer, Henry H. Miller, Daniel Price, William Rankin, Abner S. Reeve, Bernard M. Shouley, George Watson and Charles E. Young; shows which of these composed the funding and which the auditing committees; shows that, on the 7th day of January, 1884, said Abner S. Reeve died, and names his executors; shows "that there was realized, out of the sale of the four per cent. bonds, of the par value of $550,000, the sum of $660,000; this sum was lent to the firm of Fisk & Hatch, to whom had been before loaned,

and who then had in hand, the additional sum of $458,599.85 ;
the amount thus lent was increased in the month of October,
in the same year, to $1,600,000, and in the month of Janu-
ary, 1883, to $1,750,000 ;" shows that " in said last-named
month, an agreement was made between said managers and
said firm, that the money thus lent should remain in the hands
of said firm, ' right along—say for a year—except as any part
of it might be sooner required to meet extraordinary or un-.
expected demands' from the depositors of said institution, the
said firm paying interest thereon at the rate of five per cent. as
a permanent rate, and keeping at all times, in the city of New
York, in a box belonging to them (the said firm) of which they
alone had the key, and to which they alone had access, a sufficient
amount of good securities to cover the amount with ample mar-
gin ; that said moneys so loaned remained in the hands of Fisk
& Hatch until about the 29th day of March, 1883, when the
said managers requested the said firm to convert the same tem-
porarily into bonds of the United States, to answer a temporary
purpose ; to this conversion the said firm consented, and reported
to said institution that they had purchased with said money and
with other money belonging to said institution bonds of the
United States of the par value of $2,000,000, bearing interest at
the rate of three per cent., and bonds of the United States of the
par value of $700,000, bearing interest at the rate of four and a
half per cent. ; of these, as soon as the temporary purpose for
which the money was directed to be procured was answered, three
per cent. bonds of the par value of $1,000,000, four and a half
per cent. bonds of the par value of $200,000, were sold during
the month of April, 1883 ; all the residue of said bonds re-
mained, by permission of said managers, in the hands of Fisk &
Hatch, who had the privilege of using them in lieu of the money
agreed to be lent as aforesaid, until on or about August 15th,
1883, when the $1,000,000 of three per cent. bonds, parcel of
said residue, were taken to Newark and thereafter kept in the
vaults of the institution, but the four and a half per cent. bonds,
so reported purchased and still remaining unsold (the par value
of which amounted to $500,000), were allowed by the said man-

agers to remain in the possession, use and control of the said
Fisk & Hatch until their failure on the 15th day of May, 1884,
as an equivalent in part for the money agreed to be loaned in
January as aforesaid;" and shows that said transaction was con-
trary to law and to the orders of the court; shows that after the
temporary purpose of the conversion of money into bonds had
been answered, the managers began again to lend money to said
firm subject to the terms of said agreement—April 30th, 1883,
amounting to about $222,000; on July 31st, 1883, to $506,000,
increasing until February 29th, 1884, when it amounted to
$987,000, all which was in addition to the $500,000 four and a
half per cent. bonds above mentioned; shows that this money
was again converted into bonds of the United States for a few
days, and the bonds almost immediately reconverted into money,
and this money again lent to Fisk & Hatch April 30th, 1884;
the amount thus lent was $851,000, and at the time of the fail-
ure of said firm, May 15th, 1884, $845,532.04; shows that to
secure said loan, said firm deposited in said box, at different times,
bonds of the United States, of the Chesapeake and Ohio railroad,
of the Elizabeth, Lexington and Big Sandy railroad, and stock
of the Central Pacific Railway Co., which were used and changed
by said firm as suited their convenience; shows that said firm,
at all times, exercised complete control over said collaterals, and
that when they failed they had all been used and the money
so lent to it remained without security; shows other similar
transactions between the institution and said firm; shows that
when Fisk & Hatch failed (May 15th, 1884) they ought to
have had in their possession United States bonds amounting to
$2,037,000, the market value of which was $2,329,600, and
money to the amount of $846,632.04, constituting more than
one-half of the entire assets of said institution; shows that on
May 15th, 1884, Fisk & Hatch became insolvent, and stopped
business; their liabilities greatly exceeded their assets; shows
that they had pledged, sold, or otherwise disposed of all of the
said bonds, and were unable to return the said money so loaned
to them; shows that Fisk & Hatch transferred to the president
of said institution, on account of their liability, a large number

of miscellaneous securities; shows that the loss to said institution from said transaction with Fisk & Hatch is over $400,000, which resulted from the gross negligence or breach of trust of the said managers; that these transactions produced the insolvency of said institution; shows that complainant made diligent efforts to obtain from Fisk & Hatch the money due to the institution from them; that he could not do so by legal process, and that if he commenced legal proceedings they would make an assignment of such property as they still had, which was significant in amount, in which event but little, if anything, would be realized; that they informed complainant that they would be able to borrow said $845,632.04, and would pay it to him, provided he would immediately release them from all further liability to said institution, but that only on such condition could such money be obtained; that being satisfied that said representations were true, and by advice of counsel, and as the only means of obtaining from said firm for said institution and its depositors any further sum of money or other valuable thing, he did, on May 29th, 1884, enter into an agreement under his hand and seal with Fisk & Hatch, in and by which it was recited that Fisk & Hatch had received United States bonds of the par value of $2,036,000, and for account of said institution, $845,632, and that said Fisk & Hatch had delivered certain securities to said institution, in lieu of said bonds, and that since all such transactions the complainant had been appointed receiver, and that they had agreed to settle their differences, and declared that Fisk & Hatch, in consideration of the sale to them of said government bonds by said complainant, sold and transferred to him all of certain choses in action and property therein referred to, in consideration of which said receiver bargained, sold, transferred and set over unto said Fisk & Hatch all of said government bonds, and then further recited that Fisk & Hatch had paid to the receiver $847,862.49 for principal, and $2,232.45 for interest, to the date of said agreement, and added:

"It is mutually understood and agreed, by and between the parties hereto, that all matters in difference whatsoever between the parties hereto and between the parties of the first part and the Newark Savings Institution, are at an end, and definitely adjusted hereby."

Wilkinson *v.* Dodd.

The bill alleges that at the time of the execution of said agreement the said receiver was ignorant of the aforesaid breaches of trust and illegal acts which rendered said managers liable ; that said managers then denied and concealed them, and alleges that he did not intend to release them, and alleges that the said pretended sale of bonds was impossible, as they were not then in the possession or ownership of the said receiver or of said institution ; and that said agreement was executed as the only means of saving to the depositors a considerable portion of the money due from said firm.

The prayer is that said managers may be decreed to have occasioned, by their negligence, illegal acts and breaches of trust, the loss suffered by said institution at the hands of Fisk & Hatch, and that they and the executors of said Abner S. Reeves, out of his estate, may be decreed to make good the same.

Fisk & Hatch were not made parties ; and it is said that this is a fatal omission. Most eminent text-writers, Perry and Lewin, are relied upon, the latter comprehending all that has been said by way of principle. He says : " If co-trustees commit a breach of trust, and a third party reaps the benefit, he must also, as a *quasi* trustee, be made a defendant ; since he is liable to be sued by the *cestui que trust*, and the equities between himself and the cotrustees ought to be settled so far as is practicable." *Lewin on Trusts (Am. ed.) 846.* And several cases have been referred to as fully sustaining this proposition ; one of them is *Munch* v. *Cockerell, 8 Sim. 217.* In this case it was plainly admitted that there may be many special circumstances which will prevent the application of the general rule. In that case the bill was filed against only part of the original trustees who had been guilty of a breach of trust. I think the case did not involve the question raised now.

Another case referred to is *Perry* v. *Knott, 4 Beav. 179,* in which the question was whether all of the original trustees should be brought in upon bill filed to establish a breach of trust by one of them. But, in that case, the master of the rolls said : " I may, without, hesitation, say this—that the difficulties under which parties labor who seek to have relief in such cases, in

respect of necessary parties, must be, before a very long time, considerably alleviated." Another case is *Consett* v. *Bell, 1 Y. & C. Ch. 569*, in which it was said that a defendant should not have been made a party. He was, in some way, connected with the alleged breach of trust. The court said he was a proper party; but did not say that he was a necessary party. The case of *Salomons* v. *Laing, 12 Beav. 377*, went no further than to say that one of the defendants was a proper party. The case of *Williams* v. *Allen, 29 Beav. 292*, can scarcely be claimed as applicable, since in that case the absent persons had an interest in the fund for life; and clearly the court could not tell to what extent to charge the trustee until the rights of the persons having the life interest were determined, and that could not be done in their absence. And it is my judgment that the case of *Wright* v. *Wood, 12 Jur. 595*, is still further from the point. In *Hutchinson* v. *Reed, Hoff. Ch. 316*, cited by Perry, § *877, note 5*, one of the questions was with respect to the ownership of the fund in controversy, and of course those who might have a just claim were necessary parties. Mr. Perry refers, also, to *Bailey* v. *Inglee, 2 Paige 278*, but the chancellor said : " Persons are necessary parties when no decree can be made respecting the subject-matter of litigation until they are before the court, either as complainants or defendants, or where the defendants already before the court have such an interest in having them made parties, as to authorize those defendants to object to proceeding without such parties. There is also another class of cases where persons who are not absolutely necessary as parties may be made defendants at the election of the complainant. Thus, if a trustee has parted with the trust fund, the *cestui que trust* may proceed against the trustee alone to compel satisfaction, or the fraudulent assignee may be joined with the trustee at the election of the complainant." *Lund* v. *Blonshard, 4 Hare 9*, cited by the last authority, is interesting, showing, as it does, how certain shareholders were necessary parties, and showing, also, what principles are useful in determining who are proper and who are necessary parties. Upon the last point it is observed : " It is difficult to lay down any general rule as to the frame of a suit by

Wilkinson v. Dodd.

·a *cestui que trust*, in respect of claims against strangers, as debt-
·ors, or liable to the trust by reason of the misconduct of the
trustees or parties to whom the stranger is primarily liable.
There are apparently three forms of suit applicable to such cases,
according to circumstances.   First, the *cestui que trust* may not
be entitled, or, at least, not able, usefully, to do more than
compel his trustees to allow him to sue the third party at law,
·as in the case of a claim for unliquidated damages, and no collu-
sion between the debtor and the trustee.   Secondly, the relief
·against the third party may be such as a court of equity will
·administer, and the *cestui que trust* may be entitled to sue the
trustees and the third party jointly, but be bound to confine his
·suit to that specific matter in respect of which alone the third
party is liable.   *   *   *   Thirdly, there are cases in which the
third party, against whom a limited demand is made, may prop-
erly be made a party to a suit for the general administration of
a trust, with which, except in respect of that limited demand,
he has no concern."

Perry, in his work on Trustees, section 879, also says : " If a
person holding a fiduciary relation, is guilty of something more
than a mere breach of trust or of civil obligation, as if he
·commits a *tort* or *delictum*, or a fraudulent or a criminal act, he
may be pursued alone, and his cotrustees need not be joined, nor
·even his confederates in the wrong."   He cites *Attorney-General*
v. *Wilson, 1 Craig & Ph. 1, 28.*   In this case the court, in
speaking of the duties of the members of a corporation, says :
"As members of the governing body, it was their duty to the cor-
poration, whose trustees and agents they, in that respect, were,
to preserve and protect the property confided to them, instead of
which, having previously, as they supposed, placed the property
*   *   *   in a convenient position for that purpose, they take
measures for alienating that property with the avowed design of
depriving the corporation of it, and, with this view, they procure
trusts to be declared, and transfers of part of the property to be
made to the several other defendants in this cause, for purposes
in no manner connected with the purposes to which the funds
were devoted, and for which it was their duty to protect and

preserve them.   This was not only a breach of trust and a viola-
tion of duty towards the corporation, whose agents and trustees
they were, but an act of spoliation against all the inhabitants of
Leeds liable to the borough rate.    *    *    *    If any other agent
or trustee had so dealt with property over which the owner had
given him control, can there be any doubt but that such agent
or trustee would, in this court, be made responsible for so much
of the alienated property as could not be recovered *in specie?*
*    *    *    It was then urged that all of the governing body, at
least all who took any part in these transactions, ought to be co-
defendants.    Upon this point Lord Hardwicke's authority in the
Charitable Corporation case is of the highest value.    It was urged
that as the injury had arisen from the misconduct of many, each
ought to be answerable for so much only as his particular mis-
conduct had occasioned; but Lord Hardwicke said: 'If this
doctrine should prevail, it is, indeed, laying the axe to the root
of the tree.    But if, upon inquiry, there should appear to be a
supine negligence in all of them, by which a gross complicated
loss happens, I will never determine that they are not all guilty,
nor will I ever determine that a court of equity cannot lay hold
of every breach of trust, let the person guilty of it be either in a
private or public capacity.'    In cases of this kind, where the
liability arises from the wrongful act of the parties, each is liable
for all the consequences, and there is no contribution between
them, and each case is distinct, depending upon the evidence
against each party.    It is therefore not necessary to make all par-
ties who may more or less have joined in the act complained of;
nor would any one derive any advantage from their being all
made defendants, because as the decree would be general against
all found to be guilty of the charge, it might be executed against
any of them.    It is evident that Lord Hardwicke, in the case of
the Charitable Corporation, considered that each defendant would
be liable for each transaction in which he had been a party."

*Cunningham* v. *Pell, 5 Paige 607*, is also cited by Perry.   On
page 612 of that case the court say: " In the case of *Protection
Insurance Co.* v. *Dummer*, decided in this court in April, 1834,
but which is not reported, it was held not necessary to make all

Wilkinson v. Dodd.

the fraudulent directors parties to a bill filed for the purpose of obtaining satisfaction for a fraudulent breach of trust," and that doctrine again prevailed in the case of *Cunningham* v. *Pell*. See, also, *Seddon* v. *Connell, 10 Sim. 79, 86 ; Stainbank* v. *Fernley, 9 Sim. 556 ; More* v. *Rand, 60 N. Y. 208; Wilson* v. *Moore, 1 Mylne & K. 127, 143.*

In the case with which I am dealing, the managers had been before this court and the court had made an order, and amongst other things had directed the managers to invest certain moneys in the bonds of the state of New Jersey, of the United States, and of the city of Newark, and in bond and mortgage to the extent of fifty per cent. of the amount of the " new depositors." Certainly this direction was calculated to awaken confidence. And during all the time that the managers were engaged with Fisk & Hatch in the manner above detailed, they were publishing notices in the newspapers to the effect that they were acting under the orders of the court, which must have been for the purpose of attracting the attention of depositors and of getting their earnings on deposit. Now, under these circumstances these managers obtained $2,037,000 of money on deposit, which they converted into bonds, and then handed the bonds over to Fisk & Hatch, and also $846,032 in money in the manner set forth above in detail. This comprised more than half of the assets of the institution. And when the day of adversity came to Fisk & Hatch the managers had nothing but the promise of Fisk & Hatch to show for their bonds and money, and Fisk & Hatch had not one of the bonds to return to the managers.

I think this statement will lead any unbiased mind to the conviction that the managers were wantonly and willfully guilty of a misfeasance and of a fraud. I so conclude, and consequently shall advise that Fisk & Hatch are not necessary parties. I can see no reason for requiring the injured party to go after all the parties who may have joined in ruining him. I can see no more reason for requiring Fisk & Hatch to be made parties than any others who may have held the bonds with notice.

In the next place, is there such a case presented by the bill as will warrant the decree of this court in favor of the complain-

ant, if the statements made be established by due proof? The
defendants insist that the agreement made between the receiver
and Fisk & Hatch, as set out in the bill, is destructive of any
equitable rights which he might otherwise have had. It is in-
sisted that that agreement was made before the litigation, with a
full knowledge of all the facts and circumstances, after long and
careful deliberation, with a full view and knowledge of all the
consequences, by and with the advice of counsel learned in the
law, and by and with the sanction of this court.

Again, it is insisted that the fair presumption is that, in em-
ploying, in the agreement, the language of a technical, absolute
sale and assignment, the parties intended truthfully to character-
ize the transaction, and to give it all the attributes and conse-
quences of a sale and assignment, including not only an impli-
cation, but a warranty of title.

That is, that the receiver intended to confer on Fisk & Hatch,
who had no title, a perfect title, so that neither the receiver, in
behalf of the bank, nor the managers themselves, should they
seek indemnity, could maintain an action or suit against them.

It is likewise said that the bill is based on the ground that
the institution had no title to the bonds, but it is urged that the
terms of the agreement negative any such notion, and show that
the institution had full possession and an unimpaired title, and
also negative the allegation that the defendants had done, or
omitted to do, any act whereby the title could have been im-
paired.

And it is also urged that the bill itself, in the allegation "that,
at the time of the execution of said paper-writing, your orator
was ignorant of the aforesaid ·breaches of trust and illegal aets.
which rendered said managers responsible to your orator as
aforesaid," sustains the latter view of the case.

Therefore, the proposition is that, however clear or strong the
case may be upon the face of the bill demurred to, independent
of, or without, the agreement referred to and incorporated in
the bill, yet, with that agreement, or depending on that, the case
is devoid of all equity, because, in one allegation, it appears
that the managers, whom the complainant represents, handed

Wilkinson *v.* Dodd.

over all of the said bonds to Fisk & Hatch, without any secur-
ity, and that Fisk & Hatch had pledged, sold and assigned them
all, and had no control of them at the time of their insolvency
and at the time of the appointment of the complainant as re-
ceiver, and in the next allegation, an agreement appears, in and
by which the complainant, as receiver, bargained, sold, trans-
ferred and set over to Fisk & Hatch all of the said bonds.

In disposing of questions of this nature, on demurrer, I can
only be governed by the statements that are well pleaded. Lay-
ing·out of view the agreement, and the questions hereafter to be
considered, I have not the slightest doubt as to the liability of
the defendants upon the bill as framed. Is the case thus made
destroyed by the introduction of the agreement and the facts
therein contained? As above stated, the principal facts con-
tained in the agreement, which are relied upon as overcoming all
the equities of the bill, are the sale and transfer of the bonds by
the receiver to Fisk & Hatch, and the settlement of all matters
in difference between the parties to the agreement and the New-
ark Savings Institution.

The bill must be treated as a whole. So looking at it, it
appears that Fisk & Hatch had had the bonds and had disposed
of them, and had become insolvent. These things are distinctly
stated in the bill, but are not recited in the agreement. Cer-
tainly, had Fisk & Hatch had the bonds in their own custody,
or had they remained solvent, there would have been no neces-
sity for any agreement nor for a receiver.

It is alleged that Fisk & Hatch offered to pay the receiver
$845,632.04, on condition that he would release them from all
further liability, and it is also alleged that that sum of money
was paid upon the execution of the agreement.

Therefore, the agreement was executed, on the part of the
receiver, in consideration of the payment of $845,632.04 to him.
Thus he secured that large sum from a ruined debtor. Whatever
may be said of the form, the result was most beneficial to all
concerned. It does not seem as though it were possible to suc-
cessfully question the wisdom of the transaction. How can any
one say that the receiver was either rash, imprudent or negli-

gent. With what light subsequent events have shed upon the scene, there is no room for criticism. By the action of the receiver, the depositors have over $800,000 added to the fund for distribution, and the managers, if liable for the alleged negligence, have such liability lessened to that extent. Had the receiver failed to avail himself of this offer, he would have been guilty of the grossest negligence. It is true, he might have averted any legal liability by prosecuting Fisk & Hatch for the bonds and money, but, if the allegations of the bill, that Fisk & Hatch are insolvent, are true, such prosecution would have been utterly useless. Had he prosecuted them without more than a barren judgment, and the depositors had never learned of the offer made by them to the receiver, his course would have been approved, but had he prosecuted the broken concern, and had it become known that he refused an offer of $845,632, on condition of his surrendering all right to prosecute, in my opinion such refusal would have met with universal condemnation. Was it his duty to consider it more binding on him to preserve the naked right of the managers to sue than to make the sum of money he did for the depositors who had been wronged? I think he was under the highest obligations to do what he did, and I believe every equitable tribunal will sustain him.

These considerations show why the receiver was induced to go through the form of selling and assigning the bonds. He had the naked title and the right to the possession, but nothing more. If the statements of the bill be true, recovery of possession of the bonds was impossible, and it was equally impossible to recover their value. He received for his naked title and right to possession $845,632.

I think the receiver was right in making the formal sale of the title. If he was right in fact and from a fair business standpoint, he ought to be regarded as right in equity. It is the constant duty of this court to inquire into the intention of the parties to transactions, even though the investigation runs contrary to their most solemn covenants, and to make decrees according to the very right of the case. This is especially so in all matters of fraud. The fact that a grantor makes a deed absolute on its

face, does not prevent him from asking this court to regard it as a mortgage.

It being established, as I think, that it was right to execute the agreement, in consideration of the large sum of money thereby secured, and also that courts of equity very frequently consider the real objects of parties to agreements when that object in no way appears on the face of the agreement, we are now prepared to consider more particularly the results which, it is claimed, inevitably follow from the execution of such an agreement, when third parties are interested in the transaction.

First, it is urged that when the receiver entered into this agreement he ratified the act of the managers, and, having done this, however liable they might otherwise have been to a suit, he cannot now proceed against them. Now, I think, whether this result follows or not depends upon the real character of the act which, it is said, was ratified, whether that act was a void act, or only voidable. On this point there does not seem to be any room for discussion. The act of the managers was illegal in every sense, and consequently void. It was, in every way, directly in violation of the statute. If it was illegal for the managers to do what they did, it is impossible for me to conceive of a method by which that illegality could be overcome. The insistment leads to this conclusion : the managers did an unlawful act, but being done over by their successor it becomes lawful. No amount of repetitions or re-affirmations will confirm such contracts. *Chesterfield* v. *Janssen, 2 Ves. Sr. 125, 158, 1 Atk. 354; Story on Agency* § *240.* If ever this doctrine found a strong illustration, it is in this case now under consideration. And it impresses me that it would be against public policy to tolerate, in such cases, the doctrine of ratification. Certainly the court would not ratify or approve such an illegal and fraudulent act. Yet it was gravely insisted that the court, in approving the agreement which produced over $800,000, really approved and made effectual to all intents and purposes whatever the managers had done, however culpable. If this be so, then I will unhesitatingly concede that if the act of approval was done with full knowledge of the circumstances, these demurrers ought to prevail.

Wilkinson *v.* Dodd.

But independently of the foregoing views, the doctrine of ratification has no place here. There was no ratification, nor pretence of ratification. The receiver received nothing under that illegal contract. Under that contract with the managers, it was the duty of Fisk & Hatch to return the bonds, and of course it was equally their duty to return them to the receiver, but being unable to return them and being insolvent, the receiver simply entered into a *new* contract with them, and assigned to them his title upon an entirely new and different consideration. The managers, themselves, acted upon this view of the case; seeing the hopelessness of standing on the contract to return the bonds, they, too, accepted what Fisk & Hatch had to offer, that is, the miscellaneous securities mentioned in the bill, which they transferred to the receiver. The receiver no more approved the act of the managers than does the owner when he treats for the recovery of goods which his agent and a stranger may have joined in concealing. See *Cooley* v. *Perrine, 12 Vr. 322.*

Again, it is claimed that this agreement shows a release of Fisk & Hatch by the receiver, which takes away the right to compel contribution by the managers in case they should be obliged to pay. If I am correct in my conclusions that the managers were wantonly and willfully guilty of an illegal and fraudulent act, the doctrine of contribution cannot be invoked, and consequently the agreement to settle and adjust all differences, worked no injury to anyone. I think, in such cases, there is no contribution. *Lewin on Trusts (2d Am. ed.) 768 ; Attorney-General* v. *Wilson, 1 Craig & Ph. 1, 28 ; Attorney-General* v. *Leeds, 4 Jur. 1174 ; Miller* v. *Fenton, 11 Paige 18 ; Andrews* v. *Murray, 33 Barb. 354 ; Moore* v. *Appleton, 26 Ala. 633 ; Pomeroy Eq. Juris. § 1031 ; Heath* v. *Erie R. R. Co., 8 Blatchf. 347, 411.*

But again it is said that the agreement, operating as a release, took away the right of the managers to bring an action against Fisk & Hatch. This, it will be perceived, is but a statement in a different form of the doctrine of contribution last considered. I mention it specially since it was dwelt upon in the argument with great force.

The bill declares that Fisk & Hatch are insolvent. That
being so, what real harm was done by the release? Although,
as above shown, one wrong-doer cannot sue another for a part
of the penalty which he has paid for the wrong, yet, regardless
of that principle, in this case nothing could have been claimed
but the mere naked right to sue. That right, for the purposes of
this inquiry, must be treated as worthless compared with what was
realized. The receiver, certainly, had the right to sue, but a most
valueless right. He was obliged to regard Fisk & Hatch from
that standpoint. It was urged that they might not always re-
main insolvent. But the receiver found them so. He could not
change the situation, nor dare he wait, depending on probabilities.
Something might occur, it is said; true, indeed, but what, who
can tell? From all human experience, that something was more
likely to be the loss of the $845,000 than any substantial benefit
from the defiant preservation of the naked right to sue. The
receiver could bring his action or settle for the sum named.
What would his judgment have been worth? He would have
been under the necessity of selling it, as he would any other asset,
and it is fair to say that the receipts on such sale would have
been comparatively trifling. The consequence of that course
would have been nothing for the depositors, and nearly $1,000,000
more for the managers to pay, if liable at all. And, in addition
to that, the right of the depositors to sue gone forever, because
the receiver would have exhausted that right.

I think such questions are to be disposed of on equitable prin-
ciples; and when the right or thing claimed is comparatively
worthless, the former need not be retained for, nor the latter
tendered to, the defendants. *Babcock* v. *Case, 61 Pa. St. 427;
Smith* v. *Smith, 30 Vt. 139;* also, to the same effect, *Cooley* v.
*Perrine, 12 Vr. 322.*

I have proceeded thus far upon the ground that the managers
violated the express provisions of the law, and of the orders of
this court, in their transactions with Fisk & Hatch. But it was
most earnestly contended that the bill shows that every dollar
of money was first invested according to the statute and the
order of the court, and then handed to Fisk & Hatch, so that,

in fact, no express enactment or order was violated. Counsel says: "The loaning of part, and the leaving of the rest with Fisk & Hatch in their vault, may have been negligence or a breach of trust, but it was not in violation of the statute." The same counsel regards the transaction as "the grandest larceny he ever heard of," and said that Fisk & Hatch could have been indicted. Whether this properly characterizes the transaction or not, from a legal standpoint, it most certainly directs the mind to the character of the act committed.

But Fisk & Hatch were not alone in this transaction. Unfortunately, the defendants were with them. The defendants took the first step, and showed Fisk & Hatch how easy it was to violate the most sacred trust. If not money to be invested, the defendants took the bonds in which the money had been invested, and handed them over to Fisk & Hatch, or loaned them to them, upon the simple promise that they should be held by them subject to the order of the defendants. If this was so grand a larceny in Fisk & Hatch, were not the managers almost *particeps criminis?* True, it is said that the managers did not intend any wrong, and therefore, at most, the act can only be regarded as a breach of trust. I do not make the foregoing observations to show that the managers were guilty of a crime, but to show the enormity of the breach of trust. The protection of the statute and the order of the court were not enough; these they would observe in the letter, but absolutely disobey in the spirit.

Therefore, the insistment is that, since the law has been literally complied with, however much broken in spirit, the managers can only be charged as trustees ordinarily are charged who neglect some official duty, and that they are entitled to every right that such trustees would be, and hence that the agreement named was both a ratification and a release.

I think this position cannot be maintained. There may be cases at law which fortify it, but, certainly, it dismantles and undermines the whole structure of equity. In the plainest language, what was the conduct of the managers? It was a wrong. And none will contend that the commission of a wrong will not

Wilkinson *v.* Dodd.

give the citizen against whom it is committed a right of redress. And it was a fraud. Nor will any be found to urge that both law and equity do not, in every case, pursue the fraud-doer.

These managers owed a duty to the depositors, to invest all the money in certain securities named in the statute and in the order of the court. They performed that duty. But was that the end of their duty, under the statute or the order of the court? Did their responsibility cease, under the statute or under the order, when that act had been accomplished? I think not. The statute did not say, in express words, that the managers could not commit the securities to the flames, but both the statute and the order are mockeries, and nothing else, if they are not to be so interpreted in every line. The managers are the creatures of the statute. They must stand or fall by that and by the order of the court. It must be admitted that, under the statute, it was just as much their duty to invest as to receive, and to preserve as to invest. The duty spoken of arises, under the statute and order, the same as though each had said: "Thou shalt not commit the securities to the flames, nor expose them to any other hazard."

Every such act, every such breach of duty, is a wrong and a fraud, and is also illegal. See *Rolfe* v. *Gregory, 34 L. J. (Eq.) 274; Ferguson* v. *Kinnoull, 9 Cl. & Fin. 251, 311.* In the last case, it was remarked that "the refusal to obey the lawful decree of a court of justice is certainly wrong. We have here, therefore, the conjunction of wrong and loss; of wrong committed by the defenders, and loss suffered by the pursuers, out of which an action arises, and, *prima facie,* the action is maintainable." It is also declared in this case, that for every such wrong the parties concerned are jointly and severally liable. See *pp. 282, 289 ; Blair* v. *Bromley, 2 Ph. 354, 360.*

One of the managers, Mr. Reeves, being dead, and his executors having been made parties, it is objected that this is improper. I think this objection must give way. In all cases of fraud the hand of the court is not arrested by the death of the wrong-doer; but the same relief shall be had against his executors, and satisfaction will be given out of his estate after his death. *Kerr on*

*Fraud and Mistake 379 ;  Walsham* v. *Stainton, 1 De G., J. &
S. 678, 690 ;  Curtis* v. *Curtis, 2 Bro. C. C. 620, 632 ;  Raw-
lins* v. *Wickham, 3 De G. & J. 304, 322.*  I am not unmind-
ful of the long-established rule of *law* that the right of action
dies with the person in many cases of tort, if not all ;  but courts
of equity have administered relief·from  an early period.  See
*Garth* v. *Cotton, 3 Atk. 751, 757 ;  Lewin on Trusts 765.*  But
the statute, as interpreted by our courts, seems to have brushed
away all possible questions.  *Tichenor* v. *Hays, 12 Vr. 193.*

But it is urged that these managers were not, in any sense,
trustees, and that therefore the rule above stated does not apply.
And *Smith* v. *Anderson, L. R. (15 Ch. Div.) 247,* is relied
on.  The learned judge in that case is very emphatic in declar-
ing that there is a broad distinction between a director and a
trustee.  However, it seems to me that that case does not so
nearly meet the case I am dealing with, as do the cases already
cited, and as do the cases next named.  In *Robinson* v. *Smith, 3
Paige 222,* the court said :  " I have no hesitation in declaring it
to be the law of this state, that the directors of a monied or
other joint stock corporation, who willfully abuse their trust, or
misapply the funds of the company, by which a loss is sustained,
are personally liable as trustees to make good that loss.  And
they are equally liable if they suffer the corporate funds or prop-
erty to be lost or wasted by gross negligence and inattention to
the duties of their trust."  Page 231.  In this case the court re-
garded them as trustees.  And it seems to me that this view is
fully in harmony with that expressed in *Charitable Corporation* v.
*Sutton, 2 Atk. 400, 405, 406.*  In *Koehler* v. *Black River Falls
Iron Co., 2 Black 715,* such officers were adjudged to be trustees ;
and so, also, in *Jackson* v. *Ludeling, 21 Wall. 616 ;  Hunn* v. *Cary,
82 N. Y. 65 ;  Bliss* v. *Matteson, 45 N. Y. 22 ;  Butts* v. *Wood,
37 N. Y. 317 ;  Brinckerhoff* v. *Bostwick, 88 N. Y. 52.*

I conclude that these managers were as fully clothed with all
the powers of trustees, and unqualifiedly liable as if every one
of these depositors had entered into a written declaration of trust
with them, agreeing thereby, from time to time, to commit to
their hands, for the use and profit of the depositors, certain

moneys, and which declaration had contained all the provisions and requirements of the several acts of the legislature, under which the institution has actually proceeded, and also the orders of this court above referred to. There cannot, in reason, be any difference in principle, whether the terms of the trust are prescribed by the law-making power or by individuals; the liability must forever be and remain the same; if the proposed trustee accepts the trust, he is bound to be faithful alike in every case. It is not so much what the name imports as what duties are imposed and undertaken.

It was urged on behalf of the managers, who were not members of the funding committee, that they were not liable, since the bill shows that the funding committee had complete control of the funds and securities of the institution, and consequently the plain implication is that the rest were ignorant of the illegal transactions with Fisk & Hatch. With me this is not a debatable question. In the case of *Williams* v. *McKay, 13 Stew. Eq. 189;* the court of errors and appeals have settled it; holding that in such cases, upon demurrer, all the managers are, *prima facie*, liable. The chief-justice said : " It is only after answers and evidence, and on the final hearing, that the connection of the several defendants with the transactions in question, and the measure of the responsibility of each, can be ascertained and established."

Again, it is urged that it does not distinctly appear, by the bill, that the institution will certainly sustain a loss through the dealings of the managers with Fisk & Hatch, and that, therefore, the suit has been prematurely brought. This view of the case is certainly important to the complainant, on the ground of costs and expenses. It appears that certain securities were turned over by Fisk & Hatch, after their failure, to the managers, on account of the loss sustained by the institution. Some of these, which were valued, at the time, at $818,138.47, have since been sold for $821,225.16. The balance were valued by said firm at $1,150,330, and remain unsold. The language of the bill is :

" The value so put upon these last-named securities, by said firm, exceeded their true market value, at the time of said transfer, by at least the sum of $400,000, and has exceeded their true market value by at least that sum ever since, and the loss to said institution arising from the failure of said firm to return said government bonds and money in full (all of which loss resulted from and was occasioned by the gross negligence and breaches of trust of the said managers, in the performance of their duties, as hereinbefore set forth), exceeds the sum of $400,000."          .

Certain it is, that to affirm that thirty-six inches do not make a yard, proves nothing in behalf of a pleader; and it is quite as far from convincing to assert that, because a large portion of these securities sold for an advance, that therefore the balance will sell for enough to discharge the entire liability to the institution.

The receiver says, by his bill, that that loss will not be discharged by $400,000. That is an allegation of substance, about a matter concerning which it is his duty to be fully informed, and in which he is supported by the strongest presumptions arising from the conduct of the managers themselves. The strong presumption is that there has always been a wide margin between the true value of these securities and the amount due to the institution, or else the managers would have been enabled to save, and most assuredly would have saved, the bank from ruin and themselves from shame and mortification, by realizing on them, and so making good the great deficit. The instinct of self-preservation is so strong and predominating in the human breast, that I feel quite safe in assuming that it never fails intelligent men, under such circumstances. This consideration alone so well supports the allegation of actual loss, that I am constrained to say that such allegation is well pleaded and must be sustained.

I might add that, in my judgment, it was not the duty of the receiver to wait longer for these securities to improve in value, before filing his bill. He had long enough risked the

chances of still greater depreciation and loss. In such cases, the vigilance which the law exacts of others would be imposed upon and required of the receiver.

I shall advise that the demurrer be overruled, with costs.