## THE FIRST NATIONAL BANK OF FREEHOLD

*v.*

## JOHN I. THOMPSON et al.

[Submitted November, 1900.    Filed February 2d, 1901.]

1. Where an administrator who was conducting the business owned by decedent agreed with a bank, which was also a creditor of the estate, that if it would discount a note for him, he would pay other creditors of the estate who were pressing, and the creditors were so paid; on its transpiring that the estate was insolvent, *held*, that the bank was entitled to be subrogated to the claims of the paid creditors to the extent to which the administrator himself would have been entitled to recover for moneys advanced for such payments.

2. An administrator who advances money to pay claims against the estate is entitled to reimbursement only as to such claims as were rightfully paid.

3. Where a creditor of an estate advanced money to the administrator to pay off certain claims, the creditor was not entitled to reimbursement from the estate as to a portion of the sum advanced, which the administrator used for individual purposes, though the agreement was that it was all to be used for the estate.

4. A creditor of an estate advanced money to an administrator under agreement that it should be used in payment of claims against the estate, and the money was mixed with other funds, from which the administrator paid some individual claims.—*Held*, that in determining the rights of the creditor as against the estate for the money advanced, it was to be treated as a trust fund, and it would be assumed that the payment of individual claims was from individual funds.

5. Where an administrator of an insolvent estate, who was also an heir, paid claims which were charges on the realty, he being unauthorized to pay such claims, the presumption was that the payment was not as administrator, but as heir. Therefore, creditors who had loaned him money under agreement that it was to be employed in paying claims against the estate were not entitled, as against other creditors, to be subrogated to the rights of those whose liens were so discharged, though such right might have existed as against the heirs, the intestate not being bound personally to pay such charges.

6. Where an administrator of an insolvent estate, who was also one of the heirs, advanced money in paying claims which were charges on the realty, and likewise personal obligations of the intestate, he was only entitled to a *pro rata* allowance for his payments so far as they were payment of a personal obligation. Therefore, creditors who loaned the

First National Bank of Freehold *v.* Thompson.

administrator the money so advanced, under agreement that it was to be used in paying claims against the estate, were not entitled to be subrogated to the rights of those creditors whose liens had been discharged.

7. The bank was not entitled to be subrogated to the rights of creditors whose claims, which were liens on the realty, had been discharged by such payments on the ground that creditors having liens might pay off other liens for the purpose of preserving their securities, since it was a loan on its part to the administrator, and not a payment of other creditors.

8. Where premises were insured five years after the owner's death, and a note for premiums was given by the heirs and endorsed by the administrator, the insurer had no claim against the estate, the title being in the heirs, and it appearing that they had insured on their own account and for the benefit.of a mortgagee.

9. Where one having a claim against an estate entered into an agreement with the heirs, one of whom was also administrator, whereby claimant agreed to accept a stipulated consideration in full settlement of all claims "against the estate of J. I. T., his heirs or administrator," the release was valid as to any claim against the administrator, though he was not an express party in his official capacity.

10. Orphans Court act, sections 70 to 94 (*Gen. Stat. pp. 2370, 2377*), treats the fund derived from the sale of a decedent's real and personal property as a blended fund from which debts are to be paid. Section 77 provides that, on order obtained by the personal representative within one year after decedent's death, the decree shall vest in the purchaser all the title of the intestate. After land was sold in partition proceedings by the heirs more than a year after the intestate's death, the administrator made application, under rule 155, which allows the chancellor, on application in partition sale, where the personalty is insufficient to pay the debts, to make such order, touching the disposition of the proceeds, as shall be necessary for the ascertainment and payment of the debts.—*Held*, that there was no distinction between the proceeds from the sale of personalty in such proceedings and the sale of realty, and therefore a waiver of the statute of limitations by the administrator in an action on a claim applied alike to the entire proceeds, and not merely to the proceeds from the personalty.

11. Orphans Court act, section 77 (*Gen. Stat. p. 2373*), provides that where land is sold by an order of the orphans court, not obtained within one year after the ancestor's death, the purchaser takes only such estate as the heirs were seized of at the time of the making of the order. Land was sold in partition proceedings by the heirs more than a year after the ancestor's death, and the administrator made application that the proceeds be devoted to payment of debts.—*Held*, that a creditor of an heir who issued attachment after the decree of sale, but, before the sale, attained a priority over creditors of the estate, as the decree transferred the attachment to the proceeds.

12. Where the court of chancery assumes jurisdiction of the entire settlement of an estate by reason of a bill filed against the heirs and administrator by a creditor, the assets will be applied as they would be applied in the probate court.

13. *Gen. Stat. p. 2408* provides that an administrator, who in good faith pays a just claim not presented under oath, shall be allowed therefor, or if the estate is insolvent, and such creditor was paid in full, the administrator shall be allowed a *pro rata* allowance. *Gen. Stat. p. 2414 § 250* empowers the orphans court, on application of a creditor any time before distribution, to extend the time for presentation of claims.—*Held*, that where an estate was thought to be solvent, and orders were made limiting and barring creditors, but afterwards, in partition by the heirs, the administrator made application that the proceeds be subjected to the debts, and a creditor filed a bill against both heirs and administrator, the administrator was entitled to a *pro rata* allowance for payment of debts, not verified by oath, made before the filing of the bill.

On bill.

*Mr. Eusebius W. Arrowsmith,* for the administrator of Joseph I. Thompson.

*Mr. Frederick W. Hope,* for the Second National Bank of Red Bank.

*Mr. William II. Vredenburgh,* for the First National Bank of Freehold.

*Mr. Frank P. McDermott,* for Wade T. Little.

*Mr. Edmund Wilson,* for W. A. French.

*Mr. James E. Degnan,* for Allaire & Son.

STEVENS, V. C.

Joseph I. Thompson died intestate in January, 1893. He was the owner of several parcels of land and, among other things, of a hotel property at Atlantic Highlands. His personal property consisted chiefly of farm stock and implements and of the furniture of the hotel.

He left four children—John I. Thompson, Cornelius J. Thompson, Margaret M. Riker and Eleanor S. Benton. John I. Thompson took out letters of administration.

When Joseph I. Thompson died, and for some time after-

First National Bank of Freehold *v.* Thompson.

wards, it was thought that his estate was solvent. It has since proved to be insolvent.

The personalty on the farm sold for $877.19. The residue of the personalty sold for $2,109.64.

In September, 1898, a partition bill was filed. On March 29th and on April 26th, 1899, sales in the partition suit were had, from which the net sum realized was $10,582.50. Soon afterwards the administrator presented a petition, under rule 155, asking for the proceeds of the land sold to be applied to the payment of the debts of the decedent. On June 17th, 1899, the First National Bank of Freehold, claiming to be one of the creditors of the estate, filed its bill against the administrator and heirs-at-law, praying that the administrator might be decreed to account for the personalty and for the proceeds of the realty in this court, instead of the orphans court. It was conceded by the counsel representing the conflicting interests of the various creditors that such an accounting would be proper, in view of the intricacy of the case, and on February 21st, 1900, a decree was made accordingly. The administrator filed an account and a statement of claims. Exceptions were taken thereto. A hearing was had, at the same time, on the petition in the partition suit, on the answers in the administration suit and on the exceptions.

The questions requiring solution are numerous and complicated.

(1) The decedent had for many years prior to his decease conducted a hotel at the Highlands, known as Thompson's Pavilion Hotel. After his death, apparently by consent of all the heirs, his son and administrator, John I. Thompson, conducted this same business up to, or nearly up to, the time when the property was sold. The decedent had contracted a large number of debts, and, at the time of his decease, owed (*inter alia*) money to the Atlantic Highlands Bank, the First National Bank of Red Bank and the Second National Bank of Red Bank. John I. Thompson, shortly thereafter, opened an account, as administrator, in the Second National Bank of Red Bank. On February 24th, 1893, he transferred, from the account standing in

First National Bank of Freehold *v.* Thompson.

his father's name, to his account as administrator, $29.92, and, on the same day, he deposited to the credit of this account, of his own money, $2,521.87. After that he continued to make deposits, principally of money received in the hotel business. Out of the moneys thus deposited he paid hotel bills of his own and debts of the estate. Among the decedent's creditors was, as I have said, the Second National Bank, to which the sum of $3,555.04 was owing on various discounted notes. In July, 1893, the administrator saw the cashier of that bank and told him that there were debts pressing the estate; that he had some money on hand, but that he needed it all in the running of the business; that if, however, the bank would agree to discount a note for him later, he would pay, out of the money then in hand, the claim of the First National Bank and the claims of some other creditors of the estate who were annoying him. The bank agreed to do this and the administrator paid out of the moneys thus deposited several of these creditors, and, among others, the First National Bank and the Atlantic Highlands National Bank.

On November 3d, 1893, the Second National Bank, in accordance with its agreement, put to the credit of his account the sum of $7,855.39, the proceeds of a note of $8,000, which he had presented for discount a few days before. When the bank placed this sum to his credit it charged him, however, with the amount of his father's indebtedness ($3,555.04); and, so in fact, he got only the difference, viz., $4,200.35. He had at this time in addition a bank balance between $500 and $600. He does not appear to have made any other deposit until March, 1894, except a deposit of $125 made in January. Out of the moneys thus placed to his credit he paid the First National Bank, in addition to what he had already paid it, $496.92, and the Atlantic Highlands National Bank $727.05. He also paid other claims against his father's estate and various debts of his own.

The note of $8,000 was subsequently reduced to $7,500, the principal now owing. The bank claims to be subrogated to the rights of the creditors whom Thompson paid out of the proceeds of the $8,000 note.

The creditors actually paid were of two classes—unsecured creditors, like the banks and others, and creditors secured by mortgage or tax lien. As to the unsecured creditors the claim is that the banks are entitled to stand in their place, not indeed to the extent to which they have been paid, but to the extent to which they ought to have been paid; for it is conceded that the estate being insolvent, no unsecured creditor was entitled to be paid in full. As to the secured creditors, the claim is that as they were entitled to be paid in full, the banks are entitled to whatever was actually paid to them. As will be seen hereafter, these two kinds of claims rest upon entirely different grounds.

The law on the subject is entirely settled in this state. Subrogation is either legal, that is, given by the law, or it arises out of convention or contract. *Legal* subrogation is allowed only in cases where the person advancing money to pay the debt of a third person stands in the situation of a surety or is compelled to pay the debt to protect his own rights. *Shinn* v. *Budd, 1 McCart. 238; Bigelow* v. *Cassedy, 11 C. E. Gr. 558.* Conventional subrogation results from an agreement, made either with the debtor or creditor, that the person paying shall be subrogated. *Receiver* v. *Wortendyke, 12 C. E. Gr. 660; Kocher* v. *Kocher, 11 Dick. Ch. Rep. 547.* In the case in hand, the bank did not pay any creditor. When it lent the money, it dealt with the debtor only and did not bargain for subrogation. It lent money to pay debts of the estate, but it did not agree with the administrator that it should be substituted to the place of the creditors as against the estate. If the claim of the banks rested here, it would consequently fail. I think it is clear, however, that they are entitled to subrogation on another ground. The principle is thus stated by Mr. Sheldon (§ *206*) and the text is borne out by the cases cited:

"Though creditors who have made advances or rendered services to a trust estate, must ordinarily look to the trustee personally for their payment, yet if the trustee would be entitled to reimbursements from the estate for his payment, and he is insolvent or a non-resident, equity will substitute the creditors to the rights of the trustee and allow them to be paid directly out of the estate."

13

And the reason for this rule obviously is that the creditor's money has gone into the estate and he should be permitted to follow it there; and if the estate is liable to reimburse the executor for it, as between the insolvent executor and the creditor, the creditor is the one who should have it; for his equity is superior to that of the general creditors of the executor. The case of *De Concillio* v. *Brownrigg, 6 Dick. Ch. Rep. 582,* fully supports this view and, indeed, appears to go a step further. Upon much the same equity, it is held that the proceeds of a business carried on by executors as trustees, constitute a fund in their hands for the payment of trade creditors, as *cestuis que trustent,* and that, therefore, a court of equity will pursue the fund and reclaim it from any one whose title does not depend upon an innocent purchase for value. *Laible* v. *Ferry, 5 Stew. Eq. 791, 800.*

It has also been held that if the personal assets prove insufficient and the executor has paid debts out of his own money to the value of the land, he may, if the land is ordered to be sold, retain the proceeds for his own indemnity. *Livingston* v. *Newkirk, 3 John. Ch. 312.*

These principles control the case in hand. The money was lent to John I. Thompson, who is proved to be insolvent. It was lent to him to pay the debts of the estate. To the extent that it has been rightfully used for this purpose, the banks are entitled to be subrogated to the position of the administrator. But it must be remembered that by virtue of this subrogation, it has the administrator's right and nothing more. The question then arises, how far is the *administrator* entitled? In the first place, he is only entitled to reimbursement to the extent that he *ought* to have paid the claims. As the estate is insolvent it will have to be determined what dividend each unpreferred creditor is entitled to and the administrator will be entitled to reimbursement only to the extent of that dividend. In the second place, the banks can only claim such proportion of the money lent as was actually used in paying the debts of the estate. If the administrator used a part of the money in his own business, it is obvious that the banks have no claim

to reimbursement for that, even though, at the time the money
was lent it was understood that it was all to go to pay estate
debts.    There will be a reference to a master to ascertain just
how much of the money was applied to this purpose.    It seems
to me that, under the evidence in this case, what was paid prior
to November 2d, 1893, by the administrator on account of the
estate, with his own money, cannot enure to the benefit of the
Second National Bank.    The bank can only have the benefit of
payments made with *its* money.    Debts of the estate were un-
doubtedly paid with the money of the bank, and, to the extent
that they were rightfully paid, it is entitled to subrogation.
The Freehold bank will, on this principle and to this extent,
be entitled to subrogation, in respect to debts of the estate
actually paid by the administrator, though not presented under
oath.    As will be shown hereafter, an oath is not indispensable.

Where a person holding money in a fiduciary capacity mixes
it with his own and draws out of the mixed fund, the court
will presume that he applies his own moneys to his own debts
and the moneys held in trust to the debts of the trust.    This
is on the principle that when a man does an act which may be
rightfully performed, it will not be presumed that it was in-
tentionally and in fact done wrongfully.    *Knatchbull* v. *Hallett,
13 Ch. Div. 693.*    I do not see why this rule may not be
applied to the case in hand.    In a sense, the money when lent,
became the money of the administrator.    Suit to recover it
would be brought against him personally and not against him
in his representative character.    But as it was lent for a specific
purpose and might, as I have shown, be followed, it should be
followed on the same principle and in the same way that a trust
fund is followed.    Accordingly the master in stating the account
will assume that so long as there was money in the account be-
longing to the administrator personally, it was that money and
not the money of the bank which went to pay his individual
indebtedness.

(2) I next consider the case of another class of creditors, viz.,
those whose debts were secured.    They were mortgage creditors
and those municipalities to which taxes were due.    The claim
of the banks as to payment made to creditors of this class is,

that as such creditors were entitled to exhaust their liens, in other words, to be paid in full, if there was realized from the property enough to so pay them, they (the banks) are entitled to be paid whatever was actually paid by the administrator out of their money, and not merely a dividend.

The principle already stated is here, too, applicable. That principle is that the banks will, in respect of payments made on account of the estate, be entitled only to such share of the fund now in court as the administrator is entitled to.

I think that as far as the personal property of the intestate is concerned, it is very plain that the administrator would have no claim upon it for reimbursement in full, on the theory that he was authorized to relieve the real estate from liens. It was plainly his duty to devote the personalty to the payment of debts; not to the payment of charges on realty which had become vested in the heirs, and which, after the expiration of a year from intestate's death, those heirs might, at any time, alien, free from the lien of intestate's creditors.

The claim is made, however, that, as to the real estate turned into money, the banks stand in a different position. It is said that their money having been used to reduce or pay off liens upon it and it having presumably brought, when sold, a price just so much higher, it is only equitable that the administrator, and therefore they, should have the benefit of these payments to their full extent. The argument could be more plausibly urged in a contest between the administrator and the heirs, than between the administrator and the creditors. The creditors do not claim under the heirs, but by a title paramount to them; for the heirs take subject to the statutory lien. We must here distinguish between the debt evidenced by the bond and the encumbrance upon the land. As to the former, the administrator could pay it just as he could pay any other debt, and get a *pro rata* allowance. But the question is, could he properly discharge a *mere* lien upon real estate? He would discharge it, of course, either with the intestate's personal estate or with his own money. He would not, as I have already said, be justified in paying out personalty for the benefit of realty; for this would be giving to the heirs the money belonging to creditors. In point

of fact, he did not use the intestate's money to pay with. What he used was his own money—either money which the banks had lent him or money which he had otherwise obtained. As he was heir as well as administrator the presumption would be that he had paid as heir. But if the case were otherwise, and he paid, or thought he was paying, as administrator, still he would not be entitled to anything more than a *pro rata* allowance for his payments, regarded as payments of a personal obligation. In discharging the lien he did not perform any common law duty and he did not perform any statutory duty. His common law duty I have stated. His statutory duty was to take the necessary steps to sell the realty, if the personalty proved deficient. The impolicy of allowing an administrator to use up personalty in relieving real estate from liens—often a doubtful experiment—instead of distributing it among creditors, is so obvious that nothing short of an express statutory direction would justify him in doing so. Whether as incidental to his duty to sell, when ordered to do so by the orphans court, an administrator may use money of the estate to preserve the land until the sale, I do not consider. No application to sell was made.

It may be argued that the creditors having a lien upon the land, under the principle stated in *Haston* v. *Castner*, to which I shall refer hereafter, may discharge other liens for the purpose of preserving their securities and thus become entitled to subrogation, just as a subsequent mortgagee who pays off prior encumbrances is entitled. This argument, if sound, does not apply to the Freehold bank for it was not a creditor of the intestate. It does not apply to the Second National Bank, for that bank did not itself pay off the liens. All it did was to lend money to the administrator on the faith of the endorsed notes.

(3) I next take up the claim of Allaire & Son for premiums. It is made in respect of insurance on the hotel property procured in 1898, five years after intestate's death. The hotel premiums for that year amounted to $673.96; $273.96 were paid in cash and a note of $400 was given by the heirs for the balance. This note was endorsed by Thompson as administrator.

I think it quite plain that Allaire & Son have no claim against the estate for this payment. The title to the prcperty insured was in the heirs, who appear to have insured on their own account and for the benefit of the mortgagee. The administrator, as such, is not liable on the note. *Hellier* v. *Lord, 26 Vr. 367.* The heirs are. The administrator could not claim reimbursement out of the assets, first, because he did not pay the note, and second, because if he had, he would have paid as heir and not as administrator. Consequently Allaire & Son have no claim to be subrogated.

(4) The next claim to be considered is that of Sarah Thompson. Sarah and Emeline, sisters of intestate, had, with some intermissions, from 1853 down to the time of his death, acted as housekeepers in the hotel. They put in under oath a joint claim amounting to upwards of $20,000. Emeline died in 1894. In January, 1895, Sarah, and the four children of the intestate, entered into an agreement under seal by which it was stipulated that as a settlement and compromise of the claim which she had filed against the estate, said children would pay her annually thereafter, during her life, the sum of $600. The question to be considered is, what is the effect of this paper? The insistment is that it operated to release the heirs, but not the administrator, because he was not, as such, a party to it. The agreement purports to have been made by and between Sarah Thompson of the first part and John I. Thompson, Cornelius J. Thompson, Eleanor I. Benton and Matilda Riker of the second. It is signed and sealed by all of them. John I. Thompson, *as administrator,* was not, in express terms, a party. After reciting that she had filed a claim against the estate, which was not admitted by the parties of the second part, "who are the next of kin and heirs-at-law of the said Joseph I. Thompson, deceased," and that the parties have mutually agreed "to a settlement and compromise of the said alleged claim," the instrument proceeds as follows:

"Now, therefore, the party of the first part for herself, her heirs, executors, administrators and assigns hereby agrees to accept and does accept in full settlement, payment and discharge of all demands, claim and claims she has and claims to have against the estate of the said Joseph I.

Thompson, his heirs or administrators, by reason of the said services or otherwise, the sum of $600 heretofore received by her from said heirs, and the further sum of $600 annually during the lifetime of the said party of the first part, payable in equal quarterly payments on the first days of January, April, July and October, in each year, for and during the lifetime of the said Sarah Thompson, party of the first part."

Then follows an express covenant by the parties of the second part to make these payments. It will thus be seen that we are dealing with a claim duly presented and verified, and a subsequent "settlement and compromise" of it.

It is therein declared that Sarah accepted the annuity in full settlement of all claim "against the estate of Joseph Thompson, his heirs or administrators." It cannot be denied that the covenant to release is good as against the heirs. *Smith v. Emery, 7 Halst. 61; National Bank at Dover v. Segur, 10 Vr. 173.* But the question is whether it operates as a release in favor of the administrator. I think it does. It is founded on a valuable consideration, a considerable portion of which had, at the time of Sarah's death in the summer of 1900, been paid.

The general rule is that in the case of deeds and other specialties, *inter partes,* a third person, a stranger to the deed, cannot sue thereon, although the covenant be made expressly for his advantage (*Chit. Cont. (11th Am. ed.) 77*), but this rule has its exceptions. In *National Bank at Dover v. Segur, supra,* it was held that a third person, not a party, might enforce a covenant made for his benefit if it clearly appeared on the face of the instrument that it was the intention to give him the right to sue. It was conceded that, on the authorities, there must be something more than the covenant itself to evidence this right. Chief-Justice Beasley said that the rule that the mere fact that the covenant, made in terms, with a person not a party, did not of itself manifest an intention to confer the right, was entirely technical; that it rested more upon authority than right reason, and that it should not be pushed beyond the very letter of the cases to which it was applied.

Now John I. Thompson was a party to the instrument in question, but was not, in so many words, a party in his character of administrator. The claim, however, which was being settled

was, in the language of the paper, a claim "filed against the estate," that is, a claim which had been presented under oath to the administrator. It was from this claim that Sarah discharged not only the "estate" of Joseph I. Thompson and his heirs, but also his *"administrator."* I have been referred to no case and I do not believe that any can be found in which, under such circumstances, it has been held that the administrator, being in fact a party to the release, could not, merely because he is not designated "administrator" in the premises of the instrument, take advantage of it. If he was in fact a party to it, why should he not have the right to enforce its provisions just as he finds them? To hold otherwise would be, as it seems to me, to evince more partiality for artificial rules than was, according to the late chief-justice, shown by Lord Coke when he laid down the one in question.

I was referred to the case of *Shipman* v. *Lord, 13 Dick. Ch. Rep. 385,* where a discharge of claims was held not to include the discharge of a security. The obvious difference between that case and this is, that in that case the court could find no clear evidence of an intention to relinquish the Burnham agreement, whereas, in the case at bar, the instrument, in plain language, releases the estate and the administrator of the estate, in consideration of the unqualified covenant on the part of the four heirs (liable only, without the covenant, to the extent of the lands descended) to pay $600 annually during the life of the covenantee. I think, therefore, that the estate is discharged.

(5) I next take up the claim of Wade T. Little. The objection against this claim is that it is barred by the statute of limitations. Mr. Little was the manager of intestate's hotel. His claim is for services rendered in that capacity from April 1st, 1882, to January 1st, 1893. He gives credit for payments on account, made as late as the year 1892. He presented his claim under oath to the administrator in October, 1893, before the decree barring creditors was entered (April 28th, 1894) and, as his evidence shows, before the rule to limit creditors expired (October 26th, 1893). He recovered judgment by default for $6,167.48 against the administrator on February 10th, 1900. The administration suit was not begun until June 17th, 1899.

That a personal representative may waive the benefit of the statute of limitations has been often decided in this state. *Pursel* v. *Pursel, 1 McCart. 514; Boynton* v. *Sandford's Executors, 1 Stew. Eq. 184; Shreve* v. *Joyce, 7 Vr. 44.* That the administrator has done so in the present case cannot be disputed, for he did not plead it, and has otherwise recognized the claim as subsisting. The insistment is, however, that while such waiver may be good as against the personal estate in his hands, it is of no effect as against the land. As to the personalty there can, I think, be no doubt. As to the realty the case presents this situation. When the intestate died, and for some time after, the estate was thought to be solvent and no application to sell was made to the orphans court. The administrator did not move in the matter until after the land had been sold in the partition suit. Then he applied to this court, under rule 155, for an order directing that the proceeds of the sale be applied to the payment of decedent's debts.

The rule, so far at least as it applies to partition, appears to be found in section 20 of the Sales of Land act (*Gen. Stat. p. 2984*), which provides that

"In all suits in the court of chancery for the partition or sale of lands, where the personal estate of the ancestor, from whom the said lands descended, is insufficient to pay his just debts, it shall be lawful for the chancellor to direct such lands to be sold, freed from the lien of such debts and to make such order touching the disposition of the proceeds of sale as may be necessary for the ascertainment and payment of such deficiency thereout, before the distribution of the fund."

Section 77 of the Orphans Court act (*Gen Stat. p. 2373*), provides that where lands are sold by order of the orphans court, on the application of the personal representative, the deed of conveyance shall vest in the purchaser all the estate that the testator or intestate was seized of at the time of his death, if the order be obtained within one year thereafter, and if the order be not obtained within that time, then the conveyance shall vest in the purchaser all the estate that the heirs or devisees of the testator or intestate were seized of at the time of the making of the said order.

First National Bank of Freehold *v.* Thompson.

In the case in hand the decree for sale made in the partition suit does not contain a direction that the lands shall be sold free from the lien of the debts.   Such a decree was not necessary, for the sale did not take place within the year.   Being held at the instance of the heirs after the expiration of the year and operating by the statute (*Gen. Stat. p. 2425 §§ 18, 39*) "as an effectual bar both at law and in equity against the owners and against all and every person claiming by, from or under them," it necessarily had the same effect as an alienation by the heirs themselves.   Up to the time of the alienation there was a lien (*Haston* v. *Castner, 4 Stew. Eq. 697*) ; but thereafter the creditors could look only to the proceeds.   These proceeds are not, either by the above-quoted statute or by the rule, paid directly to the creditors.   They are given to the personal representative and he makes distribution.

The question then is this, where the administrator is unwilling to plead the statute, must he distribute the personalty according to one rule and the realty according to another?   It seems to me that he must distribute both species of assets in the same way.   If the creditor is entitled to the one, he is also, in the same measure, entitled to the other.   Sections 81 and 92 of the Orphans Court act provide that the estate, real and personal, in case the same shall be insufficient to pay all his or her debts, shall be distributed among his or her creditors, in proportion to the sums that shall be due to them respectively.   The only exception is that the debts which by the act are made preferred shall be first paid.   There is in these provisions no hint that the creditor entitled to a share of the personalty may stand in a different position as to the realty.   The very fact that it is the executor or administrator on whom is cast the duty of distribution, militates against the notion that the distinction exists.   The provisions of the Orphans Court act, from section 70 to section 94, treat the fund derived from the sale of the personal and real assets as a blended fund, and the only direction is to pay debts out of this fund.   Except in the case of insolvent estates it is for the executor or administrator alone to say what claims he will allow.   If he pays claims that he ought not to have paid, the proper remedy of the legatee, devisee or distributee is to except to their allowance when he presents his account.

He may, as I have said, waive the statute of limitations and although by doing so, he may diminish the share of the personalty and perhaps of the realty, those entitled to the residuary estate cannot object. When he makes application to sell lands, the orphans court is, in general, without power to determine the validity of the claim on which he bases his application. *Miller* v. *Pettit, 1 Harr. 421; Vreeland* v. *Vreeland's Administrator, 1 C. E. Gr. 512; Smith* v. *Smith's Administrator, 12 C. E. Gr. 445; Middleton* v. *Middleton, 8 Stew. Eq. 115; First Baptist Church* v. *Syms, 6 Dick. Ch. Rep. 367.* It is, indeed, provided (section 86) that any creditor or person interested may, in the case of insolvent estates, file exceptions to the account and exhibition of claims, and I see no reason why a creditor may not except to any claim exhibited on the ground of its being outlawed. But it is further provided (section 87) that the creditor, whose claim is excepted to, may elect to proceed at law or in equity; and if he does so elect the orphans court is ousted of its jurisdiction. If he sue at law and the executor does not plead the statute, then the judgment is conclusive of the validity and amount of the claim. So that even here the personal representative may recognize the claim if he will. It does not by any means follow that because the heirs, in an action against them, may plead the statute, therefore the administrator must. This would be to assert that in all cases where lands are to be sold the discretion of the executor is taken away even as to payment out of personalty; but this is manifestly not the law. I think, therefore, the claim of Little must be allowed.

(6) The claim of French & Company is next to be considered. This firm issued an attachment against Margaret Riker and Eleanor Benton, two of the heirs of Joseph I. Thompson, after the decree for the sale of the land in the partition proceeding January 24th, 1899, and before the sale (April 26th, 1899). The question is whether this attachment is a prior lien upon the proceeds of sale. I think it is. *Bockover* v. *Ayres, 7 C. E. Gr. 13,* is a direct authority on this point. It was there held that a judgment against a devisee is unaffected by a sale and conveyance under an order of the orphans court for the payment of testator's debts and that the purchaser thereunder takes the

land subject to the lien. *Warrick* v. *Hunt, 6 Halst. 1,* had previously settled the principle. It is said, however, that the case of *Morse* v. *Hackensack Savings Bank, 2 Dick. Ch. Rep. 279,* reversing the decision in *1 Dick. Ch. Rep. 161,* is an authority to the contrary. It plainly is not. The only point there decided by the court of appeals was that the purchaser, under a power of sale contained in a will, became seized, under the devisor, by a title paramount to the title of the heir by descent. This is because the heir takes, and takes only, subject to the exercise of the power. But in the case of an order of the orphans court, made after the expiration of a year from testator's or intestate's death, the statute itself declares that the estate which vests in the purchaser shall be only that of which the heir or devisee was seized at the time of the making of the order. After the expiration of the year, therefore, and up to the time of the order, the heir may alien or encumber. If he encumbers, the encumbrance is paramount. The land at the time of the partition sale was subject to the lien of the attachment in question. Had it been partitioned the shares of Margaret Riker and Eleanor Benton, set off to them in severalty, would have remained subject to this lien. When their shares were converted into money, the lien was, by the supplemental decree made in this case, transferred to the proceeds of sale and so stood as a prior lien upon those proceeds. It appears to me that as long as the heirs were *seized* of the land, the judgments and attachments against them would fasten themselves upon it. The decree for sale did not of itself divest the seizin. The master's deed took effect as an actual conveyance from the date of the sale. *Morse* v. *Hackensack Savings Bank, 2 Dick. Ch. Rep. 279.* If any other judgments or any attachment, proved in this case, were recovered against the heirs before the sale, they are subject to the same observations. It is said that the attachment suit was not prosecuted. If it be insisted that the lien does not now exist I will hear counsel further.

(7) I must next consider who are entitled to distribution. The intestate died in January, 1893. An order to limit creditors was made January 26th, 1893. A decree barring creditors was made April 28th, 1894. The only other steps which the admin-

istrator took in the settlement of the estate were to file an in-
ventory and sell the personal property. He did not apply to
have the estate declared insolvent or to sell the lands. The
partition bill was filed September 3d, 1898. The original parties
were the heirs-at-law; but several creditors were subsequently
brought in, I suppose, under the act of 1884. *Gen. Stat. p.
2432.* In this suit it was only possible (1) to convert the
land into money, (2) under the act of 1884, to direct payment
to be made to the creditors having liens upon the undivided
shares of the heirs, and (3) to pay over any balance remaining
to the administrator of the intestate, to be used by him in the
payment of debts. To obtain more complete relief, the First
National Bank of Freehold, on June 17th, 1899, filed a creditor's
bill against the administrator and the heirs. Some of the credi-
tors of the intestate came in as parties and filed answers. The
bill charged that the estate was insolvent and prayed that the
administrator might account in this court, and that the proceeds
of the sale of the lands might, with the personalty, be applied
in the payment of the debts. On February 20th, 1900, a decree
was made that the administrator file an account and a list of
the claims; and the creditors were ordered to present their de-
mands within forty days from the date of the order, with a direc-
tion, however, that no creditor who had already presented his
claim under oath to the administrator should be required to
present another claim to the master. These orders were com-
plied with. The question now to be considered is, how distribu-
tion shall be made.

It is well settled that the court of chancery has jurisdiction
over the administration of estates concurrent with the orphans
court (*Coddington* v. *Bispham, 9 Stew. Eq. 575*), although it
will not ordinarily interfere with the jurisdiction of that court,
unless for some special cause. *Frey* v. *Demarest, 1 C. E. Gr.
236; Rutherford* v. *Alyea, 9 Dick. Ch. Rep. 412.* Here it is
evident that a special cause exists in the very complicated situa-
tion. In *Coddington* v. *Bispham,* Chief-Justice Depue, after
stating that whenever a bill is filed against executors, by a
creditor or legatee, touching the administration of the estate,
the suit is for the benefit of all parties and the court may

assume the general administration of the estate, says that in the course of such administration the assets will be applied as they would be applied in the probate courts. This being so, we must look to the Orphans Court act, to find the rule of distribution in the case of an insolvent estate.

The former rule was that only those creditors who exhibited their claims, under oath, within the time limited by the order of the orphans court, would be permitted to participate (*Gould* v. *Tingley, 1 C. E. Gr. 501; Lewis* v. *Champion, 13 Stew. Eq. 61*); such exhibition having been made by statute a *condition* on which the title of the creditor to share in the fund was to depend. *Van Dyke* v. *Chandler, 5 Halst. 58.* But the act of 1890 (*Gen. Stat. p. 2408; P. L. of 1898 p. 739 § 68*) seems to have modified this rule. It provides that if an executor or administrator, in good faith, pay any claim not presented under oath, and it·is proven that the claim is a just one, the executor shall have allowance for it, if there be sufficient estate to pay the debts of equal degree in full, and if the estate is not sufficient,

"then the said executor or the administrator shall be allowed for the *pro rata* amount such creditor would have been entitled to receive if the said claim or demand had been presented to such executor or administrator duly verified."

The creditor *must* be paid in full, if the estate be solvent. If the provision for the payment of a *pro rata* amount does not apply to the case of insolvent estates, it is meaningless. The question then arises as to the limit of time within which the executor or the administrator is permitted to make payment of claims not verified by oath. As the statute itself prescribes no limit, it can only be found in the nature of the proceeding itself. He would seem to have power to pay, at least up to the time that he, by application in writing, under section 82 or 91 of the former, or section 99 or 109 of the present act, represents the estate, real and personal, to be insufficient to pay its debts.

By the act of 1893 (*Gen. Stat. p. 2414 § 250; P. L. of 1898 p. 756 § 112*), the orphans court is empowered, on the application of any creditor of an insolvent estate, at any time before

distribution made, to extend the time within which claims may be presented by creditors.   Thus it will be seen that the present policy of the law regulating distribution in cases of insolvency is, in one way or another, to allow claimants to share in the assets, if they make their claims, and such claims are allowed, at any time before distribution.   By the administrator's account filed in the administration suit, no debts appear to have been paid later than 1896.   This was nearly three years before the bill was filed.   The administrator is therefore entitled to a *pro rata* allowance, on the principles hereinbefore stated, for payments made by him of debts of the decedent not verified by oath, including, of course, bond debts.

There should be a reference to a master to report (1) the amount of money applicable to the payment of claims, (2) the claims duly verified and presented to the administrator before the expiration of the rule to limit creditors, it being the time fixed by this rule and not the date of the decree barring creditors that is controlling (*Young* v. *Young, 16 Vr. 197*); (3) the claims against the decedent's estate which were not presented under oath, but which, being just claims against the estate, the administrator actually paid; (4) the claims (if any), being just claims against the estate, not included in the foregoing category, which were presented in compliance with the order of this court; (5) the claims against the heirs, which, because they became liens upon their shares of the real estate before the partition sale, are entitled to precedence; (6) the creditors who, on the principles hereinbefore stated, are entitled to be subrogated to the position of the administrator and the amounts in respect of which they are entitled to subrogation; (7) what money advanced by creditors was used to pay the decedent's debts.   On this reference the master may use the testimony taken in the cause.   If any further questions arise, or remain undisposed of, they may be brought to my attention on the coming in of the report.