This suit was brought by complainant, as receiver of Foremost Silk Hosiery Mills, Incorporated, hereinafter to avoid confusion, called Mills, against its former directors and also two corporations, Alfred Hofmann, Incorporated, and Foremost Silk Hosiery Company, Incorporated, hereinafter referred to as Company.
In substance, it is claimed on behalf of complainant, on final hearing, that conveyances were made by Mills in contemplation of its insolvency and while it was insolvent, and that the acts of its directors in consummating these transactions were such a dereliction of their duty that it renders them responsible for the dissipation of its assets.
Certain facts in the history of Mills are undisputed and these may be summarized as follows, so as to give a framework on which the disputed matter may be fitted.
Mills was incorporated in May, 1933, for the purpose of manufacturing silk hosiery. Hosiery machinery was purchased from defendant Alfred Hofmann, Incorporated, on conditional bill of sale, the validity of which is not attacked. Defendant Propper, an experienced silk hosiery manufacturer, became the head of Mills, borrowing fifty thousand dollars ($50,000) from defendant Alfred Hofmann, to pay for his stock.
The corporation was never successful. It had scarcely put its plants in running order in the fall of 1933, when there commenced a nine-week strike in the dyers trade which made it very difficult to secure the dyeing of the silk necessary for the manufacture of hosiery. Various makeshifts were resorted to, with the result that much of the hosiery manufactured during this period was below standard and production was greatly reduced. It seems that in the hosiery business there are two peaks of sale, one for the Christmas trade and a second one for the Easter trade. Deliveries for these seasons must, of course, be made in advance. As a result of the dyers strike, very few deliveries, and still less of first quality merchandise, were made prior to December 10th, 1933, and as a result, most of the orders for the Christmas trade of that *Page 525 
year were canceled. From then on, Mills was involved in financial difficulty, from which it never extricated itself, finally resulting in the appointment of a receiver the following July. Having struggled through the comparatively dull winter manufacturing season, when it sought orders for the Easter trade, it was confronted with the fact that the fashion in silk hosiery had changed, and the public was demanding what are known as "ringless hosiery." To meet this demand required a change in the knitting machinery, by the addition of certain attachments, but by the time these changes were made, the Easter peak season had been lost and the company was never thereafter able to get on its feet.
In October, Propper invested another $30,000 in capital stock. In the middle of December, Mills sold approximately $30,000 of accounts receivable to Alfred Hofmann, Incorporated, for ninety-five per cent. of their face value. About January 15th, 1934, an agreement was entered into between Mills and Company, which was owned and controlled by defendant Hofmann, and his corporation, whereby Mills agreed to manufacture and deliver hosiery to Company at certain specified prices.
Shortly thereafter, the contract was changed so as to provide for a conveyance of certain silk to Company, including all silk then in process of manufacture, the Company paying therefor the sum of approximately $30,000. On March 26th, Mills gave a lien to Company upon its thrown silk. On April 14th, Alfred Hofmann, Incorporated, re-took the machinery under the conditional bill of sale; and on May 16th, the silk covered by the lien agreement of March 26th was removed from Mills plant.
There is no substantial dispute as to any of the foregoing facts. It also seems established that the corporation steadily lost money from its operations from the beginning.
It is contended on behalf of complainant that the transactions consisting of the assignment of the accounts, the agreement whereby Mills was to manufacture for Company and the conveyances of silk in process and the thrown silk, were all part of a plan to turn over the assets of Mills to defendant *Page 526 
Hofmann and his corporation, at the expense of the other creditors of Mills and that these transactions were void, as in contravention of section 64 of the Corporation act. This requires an examination as to the status of the company at the various times the acts complained of were performed and the legality of these acts under the circumstances.
I think it has been satisfactorily shown as a necessary inference from the books of Mills that its financial condition was hopeless as early as the end of December of 1933. By that time its losses had eaten up almost all the capital investment of $80,000. It was then, as had been from the start and always continued to be, conducting its operations at a heavy loss. It had at that time already failed to meet its current obligations. It had exhausted the possibility of securing any further bank loan. The condition of Mills was desperate. From then on commenced a series of transactions which in effect transferred all the assets of Mills to Company and to Hofmann, Incorporated. First the accounts receivable of Mills were conveyed, beginning with an assignment of $29,000 about December 15th, followed during the next month or so by numerous other assignments of accounts. On January 1st, 1934, Company was organized with a nominal capitalization and actually as a dummy for Hofmann, Incorporated, which provided all the money for its operations. Hofmann himself testified that Company was formed so as not to mix up himself and his corporation on the books.
Early in January, 1934, money was needed for payrolls and for current expenses and on January 5th the directors authorized the sale of all finished goods on hand to Hofmann, Incorporated, or its nominee. Shortly thereafter, Mills made a contract with Company whereby Mills agreed to devote itself exclusively to the manufacture of hosiery to be sold by Company.
On January 27th, another agreement was entered into between Mills and Company, whereby Mills sold to Company for thirty thousand dollars ($30,000) all silk in process of manufacture, which amounted to close to eight thousand (8,000) dozen, together with certain silk, exclusive of some *Page 527 
specified silk in a designated vault. After the silk in process was completed, Mills was to continue to manufacture at designated prices, the silk therefor to be purchased in the first instance by Mills and later paid for by Company, but the title to be immediately conveyed to Company upon the start of manufacture.
The accountants' figures show that prices for this manufacture were below cost, so that operations of Mills continued at a loss. The difficulties of Mills continued and grew worse as it became evident that the change in fashion for the Easter market of 1934 handicapped a manufacturer who was not able to make ringless hosiery. Attachments for the different method of knitting were secured from Hofmann, but by the time they were installed, the spring season had gone and a large production was not attained thereafter. Meanwhile, Mills was struggling to keep going with money paid to it by Company.
On March 16th, new terms were entered into for manufacture by Mills and Company, whereby prices for manufacture were reduced and no charge was to be made for manufacture of irregulars, which constitute approximately twenty-five per cent. of production. A week or so later, new production almost stopped. On March 26th, Mills gave to Company a lien on silk belonging to Mills which was in its vaults. This was for advances to be made to enable Mills to complete hosiery then in process of manufacture. This silk was worth approximately $35,000. On May 16th, this silk was physically removed from Mills vault to the premises of Hofmann, Incorporated. In the meantime, on April 14th, Hofmann, Incorporated, had retaken the machinery from Mills under its conditional bill of sale.
On July 12th, 1934, petition was filed for the appointment of a receiver and upon his inventory, it appears that the only property in the possession of Mills amounted to a few thousand dollars of assets, exclusive of the claims in this suit. Claims have been filed against the estate, aggregating over $150,000.
It has been seen, Mills operated at a large loss from the very start and its affairs have been so conducted by its directors *Page 528 
that substantially all its assets, consisting of accounts receivable, merchandise and raw materials, have found their way into Hofmann, Incorporated. It is true that some sort of payment was made for each transfer of assets. This fact is wholly insufficient to allow all these transactions to stand. The assignments of accounts receivable were for ninety-five per cent. of face and were, in my opinion, a valid exercise of the powers of the corporation to finance itself. The transactions regarding the manufacture of hosiery at prices which entailed a loss on Mills and the creation of a lien on the supply of silk in Mills vault, come in an entirely different category. Defendant Hofmann was in control of Hofmann, Incorporated, and Company was simply a dummy organized for his and its convenience. He was also a director in Mills, having lent Propper the money to start Mills, which in turn, acquired Hofmann, Incorporated's, machinery and the use of its property. He was, of course, thoroughly conversant with all the conditions, financial or otherwise, in Mills.
From the facts shown, I think it is clear that Mills was insolvent when it made the transactions, whereby it agreed to manufacture hosiery solely for the benefit of Company and transferred title to substantially all of its material, first, that in process and second, in its stock of silk. From the situation of the Company, it clearly appears that it was not suffering from a mere temporary embarrassment, but was insolvent in the sense that it was generally unable to pay maturing obligations. Under these circumstances, a pledge of its assets to one with knowledge of the circumstances is void, even though additional funds were secured in connection with the pledge. In these particulars, the present suit comes squarely within the principles laid down in the case of Hoover Steel Ball Co. v.Schafer Ball Bearings Co., 89 N.J. Eq. 433. The court says (atp. 437):
"* * * Nevertheless, a corporation may, if temporarily in need of funds, pledge its assets if, by the pledge of such assets, moneys may be raised which will relieve it of its embarrassment and permit it to continue. Reed v. Helois Carbide SpecialtyCo., 64 N.J. Eq. 231; Miller v. Gourley, 65 N.J. *Page 529 Eq. 237; Regina Music Box Co. v. Otto Sons, 65 N.J. Eq. 582;affirmed, 68 N.J. Eq. 802. But it seems to me on the authority of Cope v. Walton, 77 N.J. Eq. 512; 79 N.J. Eq. 165, that at least it must appear, before a corporation insolvent, in the sense of laboring under a general inability to pay maturing obligations, can make, for a present advance, a valid pledge of its assets to a person having knowledge of the condition, that the pledge is in pursuance of some financial scheme which it is reasonable to suppose will result in placing the corporation in a position of solvency as contemplated by the statute. And in this connection I point out that there is a great distinction between a general inability to meet maturing obligations and a temporary embarrassment."
 * * * * * * *
At p. 439:
"* * * The company was not in need of funds to tide it over a temporary embarrassment. It was in need of working capital."
To the same effect, Regina Music Box Co. v. F.G. Otto andSons, supra, and Cogan v. Conover Manufacturing Co., 69 N.J. Eq. 809.
In Cope v. C.B. Walton Co., 77 N.J. Eq. 512, an assignment was held to be void. The court says (at p. 520):
"* * * In my opinion the company was insolvent at the time the assignment was made. It was organized in 1903 and went into the hands of a receiver in December, 1908, seven months after the giving of the order in question. It never flourished, was generally in financial straits, and was constantly helped by Allen, the defendant, who took the assignment. At the time the assignment was given the company was in arrears for taxes, was unable to pay its insurance, was in default for interest on mortgages, had a balance of cash in one bank of $3.60, in another $6.91, and in another $2.61. It could not pay its current bills in full. Its credit with the banks was exhausted. * * * The very fact that it could not undertake the road making, unless the entire project was financed by an outsider, was, in itself, a cogent evidence of its financial irresponsibility; in other words, its insolvency."
It is obvious that at least as early as the end of December, *Page 530 
1933, Mills had substantially exhausted its invested capital, had exhausted its bank credit and it was only able to continue operations by the assistance of Company for payrolls. In January, Company began to take over assets and apparently soon after, assumed full control of the affairs of Mills, which continued only as an agent of Company and for the benefit of Company. The complete surrender to Company is indicated by the fact that after January 31st, 1934, Mills had no directors' meetings and its officers acted only under blanket authority to take such steps as might be deemed necessary.
I accordingly find that the conveyance of title of the goods in process by Mills to Company, under the agreements of January 27th, 1934, and March 16th, 1934, and the lien upon the silk vaults upon Mills, under the agreement of March 22d 1934, are void, their value is recoverable by the receiver.
I find that Company, defendant Hofmann personally, and Hofmann, Incorporated, are primarily liable to the receiver for the value of these void transfers. Company is chargeable because it directly received these assets. Hofmann, personally, and Hofmann, Incorporated, are chargeable because Company was nothing but a blind or cover for their operations. Ross v. PennsylvaniaRailroad Co., 106 N.J. Law 536. Hofmann, personally, was not only a director in Mills, but owned or controlled the corporation which received the benefit of the transfers, with the full knowledge of all the facts and circumstances.
The other directors of Mills who participated in the void transfers but did not receive the benefit of them are chargeable only on a secondary liability to make good any loss that may be sustained by reason or failure to collect from those primarily liable.
The principles fixing the liability as primary upon the beneficiaries of the illegal transfers of property and as secondary only upon the directors who participated in the transfers, but did not benefit thereby are set forth inWilkinson v. Dodd, 40 N.J. Eq. 123; Mills v. Hendershot,70 N.J. Eq. 258; Gill v. State Garage, Inc., 5 N.J. Mis. R. 759.
A decree will be advised, directing the payment to the receiver, of the value of the silk transferred to Company on *Page 531 
and after the 27th day of January, 1934, whether said silk was in process of manufacture at that time, or was silk acquired by Company thereafter to be manufactured and delivered to Company and also including the value of the raw silk delivered to Company under the lien agreement of March 26th, 1934.
Company and Hofmann, Incorporated, will be allowed to prove their claims along with the other general creditors of Mills, but not to offset their claims against the amounts for which they are held liable hereunder.
A reference will be made to a special master to determine the value of the silk so transferred.