Complainant-trustees hold title to a tract of land known as Silver Lake Park in Clementon, Camden County. They were the purchasers at a foreclosure sale May 10th, 1940. Their bill of complaint, quia timet in form, seeks to have their interest in the premises, together with the interest, if any, of the several defendants, established.
Silver Lake Park Association, a corporation, owned the property from in December, 1927, until sale by the sheriff to complainants. It created two mortgages on the land; the first, in the sum of $10,000, was dated December 5th, 1927, and made to First Camden National Bank and Trust Company; the second, in the sum of $5,000, was dated April 27th, 1935, and made to complainants. From the inception of the enterprise, Silver Lake Park was operated at a loss and, in 1933, the owner ceased to operate it. The corporation was entirely without funds and, on January 21st, 1936, the state repealed its corporate charter for non-payment of taxes.
On October 31st, 1933, the bank filed suit in the Camden County Circuit Court to foreclose its mortgage. In addition to the mortgagee, Silver Lake Park Association, Theodore W. Gibbs, Edgar B. Gibbs and James W. Davis were made defendants. A final decree was entered against all defendants January 22d 1934, in the amount of $7,753.74 debt, and $127.54 costs. Execution was delivered to the sheriff but sale was not made. Instead, Theodore W. Gibbs, to protect himself, effected an arrangement with the bank as a result of which Clementon Lake Park Co., a corporation, which owned and operated a larger amusement park nearby, went into possession of Silver Lake Park and thereafter operated both.
Defendant Theodore W. Gibbs had signed the original bond for $10,000 with the Silver Lake Park Association, and to avoid a foreclosure of the accompanying mortgage personally advanced and paid a total sum of $2,551.16 from June 5th, 1931, to December 5th, 1932, on account of principal and interest. After it took over the operation of Silver Lake Park, Clementon Lake Park Co., on February 7th, 1934, paid the bank $500 on account of mortgage principal and interest and thereafter made other payments until December 5th, *Page 257 
1935, to a total, in all, of $1,989.36. Also, to keep fire insurance in effect, it paid between $300 and $400 in premiums. The operation of Silver Lake Park continued to be a losing venture after Clementon Lake Park Co. took it over; no salaries were paid to officers or for management but, even so, the income was insufficient to meet running expenses. Clementon Lake Park Co. also made up this operating deficiency.
Shortly before November 19th, 1936, a fire occurred at Silver Lake Park. Various insurance companies carrying the fire risk paid to the bank $6,200. To "protect" or "salvage" what they had already paid on account of the mortgage, Theodore W. Gibbs, on that day and for the account of Clementon Lake Park Co., also paid the bank $1,500 and had the mortgage and the final decree assigned to it.
Silver Lake Park Association, prior to the creation of the second mortgage to complainants, was indebted to Clementon National Bank on promissory notes. Complainants are liquidating trustees of certain assets of that former banking institution. They requested and were given the second mortgage as additional security for those obligations. They had paid nothing to prevent the foreclosure and a sale under the first mortgage. At the time they took their mortgage Clementon Lake Park Co. had been operating Silver Lake Park for more than a year.
On October 27th, 1939, complainants filed a bill to foreclose their mortgage in this court. A final decree was entered February 23d 1940, for $6,443.33, with interest and costs; execution was issued, and sale made May 10th, 1940. The sheriff's deed to complainants was dated May 29th, 1940; it was recorded July 11th, 1940.
First Camden National Bank and Trust Company was made a defendant in this cause; it filed an answer alleging an assignment of the decree and of the bond and mortgage and disclaiming any interest in the premises. Defendant J. Palmer Earl did not appear at final hearing and no evidence was offered for him.
Complainants' contention, on argument, was: If Clementon Lake Park Co. is entitled to a lien it must be limited to *Page 258 
$1,500, but it is not entitled to a lien because of its actual identity with Silver Lake Park Association; any other payments made by Clementon Lake Park Co. or Theodore W. Gibbs were purely voluntary or actually made by Silver Lake Park Association.
Defendants insist that Clementon Lake Park Co. is entitled to protection under its assignment for its payment of $1,500, and that it and Theodore W. Gibbs hold equitable liens or should be subrogated to the security of the mortgage and final decree to the extent of other payments made by them, respectively, to the bank.
Complainants' bill, while somewhat unusual, presents an equitable cause of action. DeCorso v. Concordia Fire InsuranceCo. (Court of Errors and Appeals), 116 N.J. Eq. 529;174 Atl. Rep. 482.
In charging actual identity of parties, complainants rely, of course, on the exception to the fundamental principle that a corporation is to be regarded as an entity separate and distinct from its stockholders and from other concerns with which it may be connected. Peckett v. Wood (C.C.A., 3d Cir.),234 Fed. Rep. 833. In our leading case of Stockton v. Central RailroadCo., 50 N.J. Eq. 52; 24 Atl. Rep. 964; 17 L.R.A. 97, Chancellor McGill quoted Lord Mansfield: "It is a certain rule that a fiction of law shall never be contradicted so as to defeat the end for which it was invented, but for every other purpose it may be contradicted." Johnson v. Smith, 2 Burr. 962.
Vice-Chancellor Sooy in Murtland Holding Co. v. Egg HarborCommercial Bank, 123 N.J. Eq. 117, 122, said: "The corporate form is as much recognized by equity as law and this court is bound by the laws governing the conduct of the corporate action." Our Court of Errors and Appeals declared, in Jackson v.Hooper, 76 N.J. Eq. 592; 75 Atl. Rep. 568: "It is fundamental that, no matter how the shares of stock are held, the corporation itself is an entity wholly separate and distinct from the individuals who compose and control it."
In most positive language, our court of last resort in two instances reversed this court for failure to properly distinguish between the fundamental rule and this exception. In *Page 259 Jackson v. Hooper, supra, the bill rested upon the theory that complainant, who united with the defendant in acquiring equal shares of all the stock of two corporations, pursuant to an agreement claimed to create a partnership, was entitled to treat the two corporations, organized under foreign laws, as mere agencies or instrumentalities in the conduct of the joint business and to subject not only the stock owned by both parties, but all the corporate property to the control of the Court of Chancery according to the principles of the law of partnership. The Vice-Chancellor held that "the complainant and the defendant Horace E. Hooper were engaged as principals in a joint undertaking;" "the English and Illinois corporations were respectively agencies by which they accomplished their results;" and that, the rules governing partnership applied and a preliminary injunction should be granted. Judge Dill, for the Court of Errors and Appeals, said: "We are constrained to differ radically from the learned Vice-Chancellor in his views of the power and scope of the Court of Chancery, in dealing with corporate property, and we reach the conclusion that neither the bill nor the injunction can be sustained." Again: "It is fundamental that, no matter how the shares of stock are held, the corporation itself is an entity wholly separate and distinct from the individuals who compose and control it." Also, "Furthermore, upon grounds of public policy, the doctrine contended for cannot be tolerated as it renders nugatory and void the authority of the legislature — a co-ordinate branch of the government — established by the constitution in respect to the creation, supervision and winding up of corporations."
In White v. Evans, 115 N.J. Eq. 177; 169 Atl. Rep. 812;reversed, 117 N.J. Eq. 1; 174 Atl. Rep. 731, Mr. Evans, who had had difficulties with his wife, transferred his farm to trustees who, in turn, conveyed it to a corporation which he had incorporated and in which he held all of the stock except qualifying shares. After the transfer there was a fire on the premises; insurance had been effected by Mr. Evans when he personally held title to the farm; the policy stipulated that it should be void if notice was not given to the insurance company of any change of ownership. No notice *Page 260 
was given of either of the two conveyances. The Vice-Chancellor, considering Mr. Evans and the corporation as one, held that the terms of the policy had not been violated. Mr. Justice Parker, for the Court of Errors and Appeals, said: "This of course amounts to saying that a corporation whose stock is all owned by an individual, and the individual himself, are the same entity in equity for the purposes of an insurance policy providing that it shall be voided by change of interest or title. Such a rule we think finds no support in reason nor in the cases. * * * The insured by his voluntary act executed a solemn deed conveying the property absolutely to the trustee which, carrying out its authority, conveyed to a corporation. There surely was a change in the title and a fundamental change. The corporation is not an individual even if the individual owned all the stock of the corporation. It is apparent that there are differences; otherwise there would be no point in having the title in a corporation."
In 18 Corp. Jur. Secundum, Corporations ¶ 5, c., the distinction between the fundamental concept and the exception is clearly stated. A corporation, it is there declared, "is to be treated as a separate entity, unless the facts show that such separate corporate existence is a mere sham, or has been used as an instrument for concealing the truth." * * * "It must appear not only that the corporation is controlled and influenced by one or a few persons, but, in addition, it is necessary to demonstrate that the corporate cloak is utilized as a subterfuge to defeat public convenience, to justify wrong, or to perpetrate fraud."
The difficulty is not in penetrating the corporate disguise to do justice but in demonstrating that the corporation is, in fact, a disguise. This, in effect, was declared by Chancellor McGill in the leading case on this subject in Stockton v. CentralRailroad Co., supra. The Chancellor added: "It must not be thought that courts are powerless to strip off disguises that are designed to thwart the purposes of the law. The mere suggestion of such a condition is an insult to the intelligence of the judiciary." "In fine," said Mr. Justice Heher in Whitfield v.Kern (Court of Errors and *Page 261 Appeals), 122 N.J. Eq. 332; 192 Atl. Rep. 48, "the conception of a legal entity distinct from the persons composing the corporation is to be disregarded, in equity, in cases not within the reason and policy of this legal fiction." Vice-Chancellor Stein said: "Where the corporate form is used by individuals for the purpose of evading the law, or for the perpetration of fraud, the courts will not permit the legal entity to be interposed so as to defeat justice." Trachman v. Trugman, 117 N.J. Eq. 167,170; 175 Atl. Rep. 147. More recently, Vice-Chancellor Bigelow, in Rippel v. Kaplus, 124 N.J. Eq. 303, 304; 1 Atl. Rep.
2d 883, quoting from United States v. Reading Co.,253 U.S. 26; 40 S.C. 425, 434, declared that where ownership of stock in a corporation "is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held, in a manner normal and usual with stockholders, but for the purpose of making it a mere agent or instrumentality, or department of another company, the courts will look through the forms to the realities of the relation between the companies as if corporate agency did not exist and will deal with them as the justice of the case may require." Some New Jersey decisions in which the corporate entity has been disregarded are: Earle v.American Sugar Refining Co. (Court of Chancery), 74 N.J. Eq. 751,761; 71 Atl. Rep. 391; Trachman v. Trugman (Court ofChancery), supra; Mitschele v. Pyramid Bond and MortgageCorp. (Court of Chancery), 124 N.J. Eq. 190, 193;1 Atl. Rep. 2d 59; Rippel v. Kaplus, supra; Newark Ladder, c., v. Furniture Workers Union, c. (Court of Chancery),125 N.J. Eq. 99; 4 Atl. Rep. 2d 49; Jackson v. Hooper
(Court of Errors and Appeals), supra; Havey v. Hofmann
(Court of Chancery), 121 N.J. Eq. 523; 191 Atl. Rep. 756;affirmed (Court of Errors and Appeals), 123 N.J. Eq. 589;199 Atl. Rep. 75; Whitfield v. Kern (Court of Errors andAppeals), supra; Ross v. Pennsylvania Railroad Co. (Courtof Errors and Appeals), 106 N.J. Law 536; 148 Atl. Rep. 741.
The party who seeks to have this court apply the exception to the rule rather than the fundamental principle that a corporation is a separate entity, must carry the burden of *Page 262 
proof. Each case must be considered by the court as a case suigeneris and the facts presented must demonstrate the misuse of the corporate form and the necessity of disregarding it to do equity. In the case sub judice, complainants have completely failed to meet this test. The evidence before me, I am convinced, would not warrant me in disregarding the basal concept that Silver Lake Park Association and Clementon Lake Park Co. are to be regarded as separate entities, and that Mr. Gibbs, although he is the principal stockholder in each of the corporations, is not to be considered one with them.
Complainants seek to advantage themselves at the expense of Theodore W. Gibbs and the stockholders, and possibly the creditors, of Clementon Lake Park Co. Their witness, Mr. Draper, proved payments to his bank, through Mr. Gibbs. Complainants had charged in their bill, but made no attempt to prove, that these were moneys of Silver Lake Park Association. The testimony is that they were moneys of Mr. Gibbs and of Clementon Lake Park Co. Complainants ask a decree which would give them the benefit of these payments and permit them to hold the park property free and clear of mortgage, of foreclosure decree, and free and clear of all claims of the defendants. So far as the proofs go, Clementon National Bank did nothing whatever to protect its claim and the same is true of complainants after they became trustees to collect this asset of that former financial institution. The record discloses that the obligation to the Clementon bank was $4,500, and that, when complainants took their foreclosure decree, February 23d 1940, the debt had grown to $6,443.33. Self-evidently, little or nothing had been collected for interest or on account of principal. Complainants did not attempt to prove that they or the Clementon bank ever made any inquiries of any one as to the operation of Silver Lake Park, as to fire insurance on the buildings, or as to the status of the first mortgage until the time of or after their foreclosure proceedings, when inquiries were directed to ascertaining the amount paid over to the first mortgagee by the insurance company.
The first mortgage of $10,000 was placed upon the property *Page 263 
when or shortly after Silver Lake Park Association became the owner of the premises. Mr. Gibbs, who had obligated himself on the bond, advanced and paid over to the mortgagee, to prevent a foreclosure, $2,551.16. When Silver Lake Park Association was without funds and could no longer operate the park, he arranged with the mortgagee for Clementon Lake Park Co. to operate it. Then that company paid $1,989.36 to the mortgagee and between $300 and $400 additional in premiums to keep the fire insurance, on the park buildings, in effect. If Mr. Gibbs and Clementon Lake Park Co. had not thus protected themselves and protected the complainants, it is most probable that any possible equity of the complainants in the property would have been extinguished by foreclosure of the first mortgage and cancellation of fire insurance.
Complainants made no effort to prove otherwise than that, when the loan was made by Clementon bank to the association, the bank looked only to the park property for possible repayment. No effort was made to show any connection of Mr. Gibbs or of Clementon Lake Park with that financial transaction. The testimony, while meager on this point, served to disclose that Clementon Lake Park Co. owned and operated Clementon Park and that Silver Lake Park Association owned and operated Silver Lake Park. Both parks were in the Borough of Clementon where the Clementon bank operated. Beyond eliciting the fact that Mr. Gibbs was the principal stockholder in each of the corporations and the contact man for each with outside interests, and that the company had taken over and operated the park of the association, complainants made no attempt to prove any confusion of assets or affairs of the two companies or misuse of the corporations by Mr. Gibbs. On the contrary, the evidence clearly indicates that these two corporations were conceived and created to become the owners of and to operate two separate amusement enterprises. This is according to common business practice. Peckett v. Wood,supra.
Complainants allege in their bill that the payment of $1,500 was, in fact, a payment by Silver Lake Park Association. No evidence in the case would justify such an assumption. *Page 264 
On the contrary, the proof is that operation of the park by Silver Lake Park Association always resulted in an operating deficiency and that it had no money and so ceased operating the park; that Clementon Lake Park Co. had and operated its own park property, and that the $1,500 came from its treasury. At that time it had been operating Silver Lake Park for more than a year, and always at a loss.
Complainants called but two witnesses, one testified only as to an inquiry by complainants of Mr. Gibbs as to the amount of fire insurance paid on the mortgage or final decree; the other, Mr. Draper, executive vice-president of the First Camden National Bank and Trust Company, was asked as to the amount received by his bank from the insurance companies, the balance then due and its payment through Mr. Gibbs. He testified that Mr. Gibbs had always, in so far as the witness knew, represented Silver Lake Park Association in matters that had to do with the bank. He said that it was his recollection that Mr. Gibbs, representing Silver Lake Park, designated to whom the mortgage and the decree should be assigned, and that both the decree and the mortgage were assigned by the bank "to a nominee named by the Silver Lake Park Association." Complainants argue, notwithstanding the obvious indefiniteness of this testimony and positive testimony directly to the contrary, that this is proof conclusive that the payment was actually made by Silver Lake Park Association. Complainants also call attention to the fact that the assignment of the foreclosure decree to Clementon Lake Park Co. was not recorded until complainants had instituted their foreclosure proceedings and the $1,500 payment was by check of the Clementon Mill and Lumber Company, stranger to the transaction. Mr. Gibbs testified that the check was in exchange for a check of the Clementon Lake Park Co. and frankly admitted that this had been done to avoid drawing a check on a Clementon bank. He was then asked if that had not been done because he "did not want the trustees, or these complainants, to know this mortgage was paid off." His answer was "That might have had something to do with it. It wasn't being paid off; I was buying the mortgage." The foregoing are the only bits of testimony *Page 265 
to which complainants could point as a basis for their argument.
The proof is uncontradicted that the $2,551.16 advanced and paid over to the mortgagee by Mr. Gibbs, was his own money. Likewise, that the payments totaling $1,989.36, made by Clementon Lake Park Co., were moneys of that company, and that the $1,500 payment was made from funds of the latter company. How possibly could the payment of these moneys be called, as complainants charge in their brief, "a scheme conceived and executed by Silver Lake, Clementon Lake and Gibbs to preserve, by the use of corporate devices, a lien on the premises and thereby deprive the complainants of the benefit of their mortgage?" What they did in fact was to protect and preserve, from 1925 to 1936, any possible equity that there might be in the Silver Lake Park property for the Clementon bank or complainants. Here there is no evidence whatever of the misuse of the corporation, Clementon Lake Park Co., to defraud complainants or anyone else. To hold that that corporate entity must now be disregarded and payments made by it held to be payments made by Silver Lake Park Association would not be to prevent injustice, but would result in injustice. "The boundaries of the doctrine," said Vice-Chancellor Bigelow inNewark Ladder, c., v. Furniture Workers Union, c., supra, "are not yet clearly established, but are being staked out slowly by accumulating precedents." For the most part, such precedents have been those where the exception to the general rule has been applied because the facts established warranted such application. This is a case, however, where the evidence does not warrant a departure from the fundamental principle that corporations are to be regarded as separate entities.
The remaining contention of complainants, that Mr. Gibbs and Clementon Lake Park Co. were mere volunteers when they made the other payments, may now be considered. New Jersey decisions recognizing rights to equitable liens have, for the most part, been in cases where an antecedent and underlying contract existed dealing with some specific property. However, this court has also recognized that the right to an equitable lien "may arise by implication out of general *Page 266 
considerations of right and justice, where, as applied to the relations of the parties and the circumstances of their dealings, there is some obligation or duty to be enforced." The quotation is from 37 C.J., Liens, ¶ 24c. Chancellor Runyon, inHaggerty v. McCanna, 25 N.J. Eq. 48, charged upon land the amount paid in satisfaction of the mortgage of another, with interest from the time of payment. In Institute Building andLoan Association v. Edwards, 81 N.J. Eq. 359, 365;86 Atl. Rep. 962, Vice-Chancellor Leaming held that a mortgagee was entitled to be restored to its original position although it had canceled its mortgage and accepted a new mortgage, permitting the judgments of creditors to become first liens — it appearing that no injury or prejudice would result to judgment creditors.
The tendency is to limit rather than extend the doctrine of constructive liens. 37 C.J. 319 § 24c. Not so, however, the doctrine of subrogation: "It is a remedy which is highly favored. The courts are inclined rather to extend than to restrict the principle. Although formerly the right was limited to transactions between principals and sureties, it is now broad and expansive, and has a very liberal application. It is no longer confined to cases of suretyship; it has become more general in its application, the principle being modified to meet the circumstances of the individual case. Ocean Accident andGuarantee Corp. v. Hooker Electro-Chem. Co., 240 N.Y. 37;147 N.E. Rep. 351; Dinsmore v. Sachs, 133 Md. 434;105 Atl. Rep. 524; Pittsburgh-Westmoreland Coal Co. v. Kerr, 220 N.Y. 137;115 N.E. Rep. 465; 60 C.J. 705 et seq." Mr. Justice Heher, for the Court of Errors and Appeals, in Bater v. Cleaver,114 N.J. Law 346; 176 Atl. Rep. 889.
While subrogation is founded on principles of equity and even of benevolence, yet it will not be decreed in favor of a mere stranger or volunteer, who without any duty paid the debt of another. Anyone, being under no legal obligation or liability to pay and having no interest menaced by the continued existence of the debt, is a stranger, and if he pays the debt is a mere volunteer. 25 R.C.L., Subrogation, ¶ 11; Shinn v. Budd,14 N.J. Eq. 234; North River Construction *Page 267 Co's. Case, 38 N.J. Eq. 433, 436; affirmed, sub nom. Upper v.Green, 40 N.J. Eq. 340; Fay v. Fay, 43 N.J. Eq. 438, 440;11 Atl. Rep. 122; Pierson v. Phillips, 85 N.J. Eq. 60:95 Atl. Rep. 622. Where, however, one has an interest which is jeopardized by the continued existence of a debt of another and, to protect that interest, pays the debt, he is not to be considered a volunteer. Suydam v. Voorhees, 58 N.J. Eq. 157;43 Atl. Rep. 4; Hildreth v. Vineland Trust Co., 104 N.J. Eq. 317; 145 Atl. Rep. 625.
"It is unquestionably the rule that, when an obligation is discharged by one not primarily liable for it, but who believes himself to be acting either in the performance of a legal duty, or for the protection of a legal right, or at the request of the party ultimately bound, and even in certain other cases, favored by public policy, where none of the above circumstances may be present, the party thus discharging the obligation is entitled in equity to demand, for his reimbursement, and subject to any superior equities, the performance of the original obligation, and the application thereto of all securities and collateral rights held by the creditor. Polhemus v. Prudential RealtyCorp., 74 N.J. Law 570, 572; First National Bank of Freehold v.Thompson, 61 N.J. Eq. 188; Pom. Eq. Jur. § 2343; 60 C.J. 694."
Mr. Justice Heher, Bater v. Cleaver, supra. The right of subrogation of a surety or a guarantor to the security of the principal debtor is not new to our law. In the early case ofIrick v. Black and Lippincott, 17 N.J. Eq. 189, Chancellor Green declared: "The right of a surety, as against his principal, to be protected from loss by reason of his suretyship, so far as it can be done without prejudice to the rights of the creditor, is a recognized and familiar doctrine of equity. When the surety has paid the debt, he may not only call upon the principal to reimburse him, but for the purpose of obtaining indemnity from the principal, he is at once subrogated to all the rights, remedies, and securities of the creditor."
Vice-Chancellor Emery, in Bennett v. Finnegan,33 Atl. Rep. 401; 72 N.J. Eq. 155; 65 Atl. Rep. 239, on demurrer, sustained a bill filed by a husband against the heirs-at-law of his deceased wife to establish a lien on the lands of which *Page 268 
she died seized. The bill was based upon the theory that the husband was to be treated in equity as the surety of his wife to the extent of his payment toward the purchase price of the lands conveyed to his wife, and to be subrogated to the rights of the mortgagee for the mortgage he had paid. The mortgage had been given at the time of the conveyance to the wife and to secure a bond given by the husband alone for a part of the consideration. Vice-Chancellor Bigelow, in Bluestone Building and LoanAssociation v. Glasser, 117 N.J. Eq. 392; 176 Atl. Rep. 314,
said: "I have no doubt that a surety who pays taxes or other charges against the property of his principal which stands as security for the debt, thereby gains a lien on the property."
In Brown v. Carpenter, 109 N.J. Eq. 208; 156 Atl. Rep. 471,
an opinion of Vice-Chancellor Berry was adopted by the Court of Errors and Appeals. The bill filed in that case was to redeem lands from the lien of certain mortgages and tax sale certificates. As here, the first mortgage had been foreclosed and a decree entered but no sale had been made. It was held that the owner of the second mortgage and of the tax sale certificates "undoubtedly" had "a right to subrogation by reason of his payment of the decree in the foreclosure suit, * * *." The court ordered that the bond and mortgage, uncanceled, together with an assignment thereof, be delivered to the owner of the second mortgage. In Elmora and West End Building and Loan Association
v. Dancy, 108 N.J. Eq. 542; 155 Atl. Rep. 796, Vice-Chancellor Berry said: "A subrogee stands in the shoes of the creditor whose claim he pays and is entitled to all his remedies and means for enforcement of the payment, of which foreclosure here was the most appropriate." Citing Seeley v. Bacon, 34 Atl. Rep. 139;Kocher v. Kocher, 56 N.J. Eq. 545; Coudert v. Coudert,43 N.J. Eq. 407; Scardone v. Sozzi, 108 N.J. Eq. 415, the Vice-Chancellor also declared: "But even if a mortgage has been paid and satisfied of record, it may, under some circumstances, be reinstated and foreclosed if the ends of justice require it. A court of equity will keep an encumbrance alive or consider it extinguished as will best serve the purpose of justice and the actual and just intention of the party. Kinkead *Page 269 
v. Ryan, 65 N.J. Eq. 726." In Minton v. Sutton, 100 N.J. Eq. 403; 135 Atl. Rep. 693; affirmed (Court of Errors andAppeals), 102 N.J. Eq. 61; 139 Atl. Rep. 600, Vice-Chancellor Backes quoted with approval from 25 R.C.L. 1345, "Where subrogation is claimed on the ground that the payment was necessary to protect the interests of the subrogee, the extent or quantity of interest which is in jeopardy is not material. If he has any palpable interest, which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could."
"The rights of a subrogee attach at the time the equities arise in his favor, which ordinarily is at the time he assumes and pays the debt." 60 C.J. 722 ¶ 31 F; Hare v. Headley, 54 N.J. Eq. 545; 35 Atl. Rep. 445. Subrogation to the rights of the creditor does not mature, however, until the debt is fully paid.Receivers of New Jersey Midland Railway Co. v. Wortendyke,27 N.J. Eq. 658; Coe v. New Jersey Midland Railway Co., 31 N.J. Eq. 105; Bluestone Building and Loan Association v. Glasser,supra. "The principle of subrogation is one of equity merely, and will accordingly be applied only in the exercise of an equitable discretion, and always with due regard to the legal and equitable rights of others." Gaskill v. Wale's Ex'rs., 36 N.J. Eq. 527.
Tested by the rules declared in the authorities cited, Mr. Gibbs, when he made his payments, was not a mere volunteer. He was an obligor with Silver Lake Park Association on the original $10,000 bond, to secure which the mortgage was given. He was made a defendant in the proceedings to foreclose that mortgage, and the final decree in the Camden County Circuit Court was rendered against him as well as the mortgagor. His payments were made to prevent a foreclosure and to forestall the possibility of a deficiency judgment against him when Silver Lake Park Association owed the Clementon bank more than $4,500 and was operating its park at a constant loss. Using his own funds and moneys borrowed from others, Mr. Gibbs made payments on account of principal and interest, totaling $2,551.16. Had he not made these payments and had the mortgagee refrained from *Page 270 
immediate foreclosure, the obligation would have been increased, and any equity out of which the Clementon bank might hope to make its debt decreased, by that amount.
While payments were being made by Mr. Gibbs on the mortgage, the Clementon bank held only a promissory note. It was not until after these payments had been made that complainants asked for and received their second mortgage. That mortgage contained the following specific provision:
"This mortgage is second and subject to a certain other mortgage made by the said Silver Lake Park Association, to First Camden National Bank and Trust Company, an association organized under the laws of the United States of America, given to secure the sum of $10,000, dated December 5th, 1927, and recorded in the Register of Deeds Office of Camden County in Book 324 of Mortgages, page 113."
It is quite obvious that the Clementon bank suffered no injury through the making of these payments and, that complainants would lose nothing it or they ever possessed if this court were to decree that the moneys so paid be charged against the land and as a prior claim to that of complainants'. It is recognizing mere justice to say that Mr. Gibbs should, if the law permits, have such protection. Complainants in filing their bill submitted themselves to this court; they asked that their interest and the interests of the defendants in these lands be ascertained and fixed by decree. They do not suggest that fraud or any deception was practiced upon them when they accepted their mortgage subject to a first mortgage of $10,000, nor, do they suggest that they made any inquiries, at that time, to ascertain the true status of that mortgage. After the fire, complainants' witness Supplee testified, complainants did inquire of Mr. Gibbs as to the amount due on the final decree. This was at or about the time when the decree and the first mortgage were assigned to Clementon Lake Park Co. Significantly, Mr. Gibbs, at that time, told the complainants that from $5,000 to $8,000 was still due on the final decree. It is also significant that complainants admit in their bill that shortly after the foreclosure sale, at which they became the purchasers, Mr. Gibbs denied or disputed their title to the premises and claimed to hold a lien or encumbrance thereon. *Page 271 
Mr. Gibbs testified that the mortgage and final decree were purchased and assigned to Clementon Lake Park Co. "to salvage what we had put up there," "to protect" the payments made. Clementon Lake Park Co. in its answer filed in this cause, charged as a fact that Mr. Gibbs denied and disputed complainants' title to the park property and claimed a lien or encumbrance thereon by reason of the payments made by him and that it, Mr. Earl, and Mr. Gibbs advanced sums reducing the first mortgage to $7,225.
It is the general rule that a person may not be subrogated to a creditor's securities until the claim of the creditor against the debtor, to secure which the securities were given, has been paid in full. It is also the general rule that a pro tanto
subrogation will not be decreed. Receivers of New Jersey MidlandRailway Co. v. Wortendyke, 27 N.J. Eq. 658; reversing Coe v.New Jersey Midland Railway Co., 27 N.J. Eq. 110; BluestoneBuilding and Loan Association of West New York v. Glasser,supra. But, where justice requires, a pro tanto subrogation may be decreed. Comins v. Culver, 35 N.J. Eq. 94. And, "Though there is no such agreement as to constitute a conventional subrogation, if the creditor acquiesces in or consents to the assertion of a subrogation pro tanto, by one who has paid a portion of the debt, no one else is entitled to object thereto." Annotation, 9 A.L.R. 1608, b; and cases cited in that note and in similar notes in 31 A.L.R. 569 III;46 A.L.R. 857; 53 A.L.R. 304.
The entire debt due First Camden National Bank and Trust Company was paid and satisfied before the assignments of the mortgage and decree were made. Clementon Lake Park Co. alone could now raise these questions. It does not. It admits the fact and justice of Mr. Gibbs' claim, and "avers the truth to be" that it, J. Palmer Earl and Mr. Gibbs "paid the major portion of the amount due on said mortgage, in consideration of which the assignment of final decree and assignment of mortgage were executed and delivered" to it. The quotation is from paragraph 16 of its answer. I shall advise a decree subrogating Theodore W. Gibbs to the security of the mortgage and the final decree protanto with Clementon Lake Park Co. *Page 272 
Now, as to the claim of Clementon Lake Park Co. for moneys paid by it to the First Camden National Bank and Trust Company, other than that of $1,500 paid at the time of the assignment. Complainants' witness proved that these payments were made; they held up the pending foreclosure; they reduced the obligation to the extent of $1,989.36. Nevertheless, I am unable to escape the conviction that, as to these payments, Clementon Lake Park Co. was truly a stranger and a mere volunteer. It had no interest to be put in jeopardy by the continued existence of the debt. "The demand of a creditor which is paid with the money of a third person, and without any agreement that the security shall be assigned or kept on foot for the benefit of such third person, is absolutely extinguished." Shinn v. Budd, supra.
Clementon Lake Park Co. is entitled, as of course, to lawful interest on $1,500 from November 19th, 1936; Theodore W. Gibbs also is entitled to lawful interest on his several payments from the time they were respectively made. *Page 273